**Shearn MOODY, Jr., Appellant,**

v.

**MAIN BANK OF HOUSTON, Appellee.**

No. 01–82–0505–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 1, 1984.

Rehearing Denied March 22, 1984.

W. Briscoe Swan, Fred W. Stumpf, Oliver, Stumpf, Falgout & Guynes, Houston, Douglas H. Chilton, Chilton & Shirley, Texas City, for appellant.

William A. Paddock, Houston, Douglas H. Chilton, Chilton & Shirley, Texas City, William E. Matthews, Vicki Birenbaum, Sewell & Riggs, Houston, for appellee.

Before JACK SMITH, DUGGAN and LEVY, JJ.

## OPINION

DUGGAN, Justice.

Appellant, Shearn Moody, Jr., appeals from a take nothing judgment based upon a jury verdict in his suit against appellee, Main Bank of Houston, to recover statutory penalties for usury arising out of a contractual clearing house and loan arrangement between the appellee bank and a Galveston bank owned by Moody.

It is undisputed that Main Bank required Moody to guarantee payment of a $116,000 judgment Main Bank had obtained against a third party as a condition of Main's continuing its clearinghouse and lending relationship with Moody's bank. Moody relies on two theories for recovery. First, he asserts that the amount he was forced to guarantee and ultimately pay constituted interest which, together with other interest charged on clearinghouse loans, rendered those loan transactions usurious. Main responds that the judgment guaranty was not interest but payment for "other banking services," including (1) forebearance of its right to terminate the troublesome clearinghouse arrangement; (2) forebearance of its right to garnish or attach funds in Moody's hand owed by Moody to Main's judgment debtor; and (3) Main's commitment to provide future clearinghouse services, including the extension of a future line of credit to Moody's bank. Moody's second theory of recovery is that, even apart from the guaranty agreement, Main Bank charged him interest in excess of the 6% maximum then allowed to be charged to an individual. Main denies the charge of usury and contests the validity of Moody's proposed "net loan" theory of interest computation. Moody asserts twenty points of error on appeal, and groups them for presentation.

W.L. Moody & Company, Bankers, is a private, unincorporated Galveston bank which appellant Moody inherited in 1968. In August 1971, being dissatisfied with the clearinghouse services provided by another Houston bank, Moody entered into a "Clearing Account Letter Agreement," a written agreement with Main Bank of Houston and Southern National Bank of Houston whereby, in exchange for demand deposits from Moody Bank, Main Bank agreed to act as a clearinghouse for Moody Bank checks with the Houston Clearinghouse Association, and to act as agent for Moody Bank with Main's correspondent bank, Southern National Bank of Houston, which was permitted to clear items through the Federal Reserve Bank of Dallas. Under the terms of the agreement, Southern National Bank would pay Moody's daily cash letters to the Federal Reserve Bank, debiting and crediting Main Bank's account with Southern National Bank. In turn, Main Bank would daily debit and credit Moody's account. Moody testified that he pledged over $1,000,000 worth of his stock in the American National Insurance Company (ANICO) to secure "daily loans that Main Bank might have to make" in the

event his bank needed immediate credit to meet its cash items. Under the terms of the agreement, each party had the right to terminate the clearing house relationship at any time upon written notice.

Beginning in early 1972, Moody encountered liquidity problems and began to experience a run on his bank's deposits. Consequently, the Moody Bank account at Main Bank began to run negative balances, at first occasionally and later consistently. In order to cover the negative balances and meet its daily cash letter, Moody had to borrow "Fed" funds on one-day demand loans from Main Bank.

By the spring of 1972, the negative balance problem with the Moody account had become unusually severe. Main Bank was questioned by both the FDIC and the State Banking Commission about the constant overdraft position of the account. At one point, Moody Bank was overdrawn by 2.2 million dollars more than Main Bank's million dollar loan limit for any single customer. In mid-April, Moody was required to lower his debt to Main Bank by selling 100,000 of the 145,000 shares of stock securing Main's advances.

By a letter of April 20, 1972, Southern National terminated the clearing agreement and notified Moody Bank that it had so advised the Federal Reserve Bank's Houston Branch and that it had been given authority on a day-to-day basis to handle Moody's cash letter on an interim basis for a period of time not to exceed two weeks. Main Bank was then forced to make other Federal Reserve Bank correspondent arrangements to clear Moody Bank checks through First City National Bank, which required Main to endorse Moody Bank checks. Moody acknowledged in testimony that in the April-May 1972 period he was not "a very attractive clearinghouse relationship for another bank to take on."

In a matter unrelated to Moody, Main Bank recovered a judgment in March of 1972 against one David Myrick in the amount of $116,000. The judgment became final in April of 1972. Main Bank was aware that Myrick was a cousin of Moody and was the beneficiary of one or more of the various Moody family trusts, from which he received distributions from time to time. Main Bank also discovered that Moody himself was about to make a payment of $350,000 to Myrick as part of an overall settlement of Moody's own complicated Moody Foundation litigation, which was tying up sales of his ANICO stock and causing his liquidity problem.

According to Moody's testimony, officers of Main Bank first sought his assistance in collecting on the Myrick judgment, and discussed with him the possibility of either garnishing Moody's planned payment to Myrick or being present when the payment was made and attaching it. In fact, Moody told Main Bank officers where the settlement with Myrick was going to be, and suggested that Main Bank's attorney be sent to attach the funds in Myrick's hands. Moody testified that he feared that if Main Bank were to garnish him ahead of his payment to Myrick, or were to interrupt by attachment proceedings while he was settling with Myrick, his arrangements might fall through. Main Bank had reason to cooperate, he stated, since his freedom to sell additional shares of ANICO stock, in order to reduce his bank's debt, was dependent on the Myrick settlement. Moody testified that Main Bank officers told him in late April or early May that they wanted him to guarantee the judgment. Moody testified that he had been led to believe that Main Bank was going to try to collect from Myrick, and that "they really weren't looking to me to pay it." He signed a guaranty about April 28, 1972, with the understanding that, if he did not, Main Bank would terminate its clearinghouse arrangement with W.L. Moody & Company, Bankers, as of that day, and would lend him no more money to cover the Moody Bank's daily cash letters.

No such guaranty was placed in evidence, but the record shows that on May 17, Moody bank employees purchased a $116,000 certificate of deposit from Main Bank and pledged it to Main Bank to secure the Myrick judgment. While Moody

testified that the purchase and pledge were done without his knowledge, he admitted that his personnel were authorized by him to do so.

Around May 19, during settlement negotiations between Moody and Myrick in St. Louis, Missouri, Main Bank's attorney flew to that city to attempt to collect on the judgment, but was asked by Moody not to interfere during the discussions, since "[w]e did not want our independent agreement with Myrick interfered with by attachment proceedings that Main Bank was going to do."

Main Bank did not pursue its efforts to collect on its Myrick judgment in St. Louis, nor did it do so thereafter. Moody did pay Myrick the $350,000 in settlement, and Moody was able to sell a sufficient amount of his ANICO stock to obtain $1,500,000, and to transfer it to Main Bank as payment on the Moody bank debt. Main Bank continued to serve as the Moody bank's clearinghouse and to provide a line of credit to meet the bank's frequent negative balances from the time Moody guaranteed the Myrick judgment until September 15, 1972, when the Moody bank was placed in receivership by the Securities and Exchange Commission for reasons unrelated to this case.

When the $116,000 certificate of deposit securing the Myrick judgment matured at the end of ninety days, on August 15, 1972, Main Bank applied the proceeds to payment of the Myrick judgment. The bank then assigned the judgment to Moody and released a deed of trust lien it had taken on Moody's ranch on September 8, two days after the receivership began.

Ten years later, Moody had still been unable to collect on the Myrick judgment despite various attempts. On more than one occasion, Moody or his agents had requested and been furnished a new assignment of the judgment from Main Bank to replace the lost original. In 1980, Moody levied execution under the judgment; required the sheriff to sell Myrick's house, and bought it for $10,000, although he testified he had reason to believe it was worth at least $150,000. That action is being contested under a claim of homestead. A second suit against Myrick has been filed on behalf of the Moody bank.

In response to the first special issue, the jury found that Moody's agreement to guarantee the judgment as a condition of Main's continuing its clearinghouse relationship with Moody *was not* obtained under duress or undue influence. By Special Issue Numbers Two and Three, the jury found that consideration *was* present in the transaction and that Moody's guaranty of the judgment *was not* interest.

Moody's points of error 3, 6, 9, and 11 through 16 share in common the premise that Moody's assumption, guaranty, and payment of the Myrick judgment was additional and usurious interest. These points of error assert either (1) that the guaranty agreement constituted additional interest as a matter of law; or (2) that the jury's answers to special issues about the guaranty agreement had no probative support in the evidence; or (3) that the jury's answers were against the great weight and preponderance of the evidence. Moody does not pursue on appeal his claim of duress or undue influence, but focuses entirely on his contention that his guaranty and payment were additional interest and not, as Main Bank urges, a payment for which he received valid additional consideration.

Moody concedes in his brief that appellee Main Bank, as well as Southern National Bank and himself, had the right to terminate the clearinghouse letter agreement by giving the required notice. His own testimony established that a correspondent bank, such as his own, normally keeps cash deposits in its account which the clearinghouse bank debits in order to meet the correspondent bank's cash letter; that the presence of such interest-free cash deposits provides the benefit and incentive to serve as a clearinghouse bank; and that when a correspondent bank must borrow Fed funds to meet its daily cash letter the loan must be repaid the next day. The early 1972 situation of Moody's constant daily overdrafts (at one time exceeding Main

Bank's million dollar loan limit by 2.2 million dollars), together with Main's daily calls from the FDIC and letters from the State Banking Commission scrutinizing the Moody account, combined to make Moody Bank an atypical and undesirable correspondent account. Southern National Bank's refusal, as Main Bank's own clearinghouse, to continue servicing the Moody account, forced Main Bank to clear Moody's account through First City National Bank, which required Main Bank to endorse Moody Bank checks.

Main Bank's former officer, Marx Edwards, testified that a large portion of his own and other staff members' time at Main Bank was spent on Moody account matters, including the hand delivery of Moody's daily cash letter, making the continuation of the relationship unprofitable for Main Bank.

■ We hold that, in answering Special Issue Two, the jury was entitled to consider the unsatisfactory prior clearinghouse relationship and to find that, in relinquishing prior clearinghouse relationship and to find that, in relinquishing its right to terminate the agreement, Main Bank gave valuable consideration in agreeing to continue the clearinghouse arrangement with Moody in exchange for Moody's guaranty of the Myrick judgment.

■ Additionally, Moody's own testimony shows that, at his specific request, Main Bank called off its efforts to attach funds in Myrick's hands during Moody's St. Louis settlement negotiations. Such forbearance in pursuing collection of the judgment was evidence from which the jury could find additional consideration to Moody.

Accompanying Special Issue Number Three, inquiring whether the assumption or guaranty of payment made by Moody to Main Bank for payment of Myrick's debt [sic] was interest for the indebtedness owed by Moody to Main Bank (and which the jury answered "It was not interest"), the trial court defined "interest" as follows:

You are instructed that the term "interest" means: Compensation charged for the use or forebearance or detention of money. Further, where a lender, as a condition of a loan and as a consideration for making it, requires the borrower to assume or pay in whole or in part the debt that another owes to this same lender, the amount of the assumed or paid-off debt is considered as interest unless the borrower also receives consideration for such action.

You are further instructed that a fee paid which commits a lender to extend credit to a borrower in the future, but does not obligate the borrower to utilize such credit, does not fall within this definition of "Interest."

■ Upon disputed evidence of whether a fee charged by a lender is a commitment fee or a device to conceal interest, a fact issue is raised. *Stedman v. Georgetown Savings & Loan Association*, 595 S.W.2d 486 (Tex.1980). A jury finding on a disputed issue must be upheld if, reviewing the evidence in the light most favorable to the finding, there is more than a scintilla of evidence to support the finding. *Id.*, p. 488. Moody's own testimony established that the result of his guaranteeing the Myrick judgment was that Main Bank agreed to provide future clearinghouse services and credit at Moody's request, and in fact did so, at Moody's periodic requests, until Moody's bank was closed.

Moody cites *Gold v. Alamo Lumber Co.*, 623 S.W.2d 453 (Tex.Civ.App.—Beaumont 1981, writ ref'd n.r.e.); *Stephens v. First Bank and Trust*, 540 S.W.2d 572 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.); and *Laid Rite, Inc. v. Texas Industries, Inc.*, 512 S.W.2d 384 (Tex.Civ.App.—Ft. Worth 1974, no writ) in support of the proposition that where a lender requires a borrower to pay another's debt as consideration for making a loan, the amount of the assumed debt is interest.

■ We do not disagree with this general proposition, but that is not the circumstance here. There is evidence to support the finding that Moody's guaranty was giv-

en in exchange for Main's forebearance of its rights both to terminate the clearinghouse relationship and to pursue immediate collection of its Myrick judgment, as well as for extension of a future line of credit for clearinghouse loans at Moody's option, and that Moody's payment was not a charge either for a specific new loan or for continuation or renewal of an existing loan. Moody's points of error 3, 6, 9, and 11 through 16 are overruled.

Moody's points of error 1, 2, 4, 5, 7 and 8 focus on his complaint that even aside from the $116,000 he was forced to pay in guaranty of the Myrick judgment, Main Bank charged and received usurious interest from him in the conduct of its clearinghouse operations. This occurred in two ways, he reasons.

First, he urges, Moody Bank was an unincorporated sole proprietorship, and Tex. Rev.Civ.Stat.Ann. art. 5069–1.02 provided, at the time of the transactions between the parties, a 10% maximum rate of interest to be charged to an individual, and a maximum of 6% where no interest rate was stated in a contract. This was such a contract with no stated rate, Moody argues, since no proof appears in the record as to what Fed fund interest rates were during this period.

■ We reject this contention. Main Bank elicited testimony from both Moody and Marx Edwards that there was an agreement that loans to meet Moody Bank's daily cash letter were to be at the same interest rate charged other banks, namely, Federal fund rates. Testimony from Moody established that the charging of Federal fund rates was "normal banking procedures," and that such rates were quoted daily in the Wall Street Journal. The six percent rate applies only where no specific rate of interest is agreed upon by the parties. Tex.Rev.Civ.Stat.Ann. art. 5069–1.03. Where, as here, there is proof of an oral agreement as to a specific, determinable rate of interest, the transaction is governed by art. 5069–1.02. *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295 (Tex.1981).

The maximum rate Main Bank could have charged Moody is, therefore, ten percent per annum.

■ Second, Moody proposes that a "net loan" balance is the proper principal sum upon which to figure interest charges. On numerous occasions, federal funds in excess of the amount needed to meet negative balances in Moody's account on that day were placed in Moody Bank's account, and interest paid was based on total funds loaned rather than the amount actually used. Moody's position is that the average "net loan" needed to achieve a zero account balance, and no more, should be considered the principal debt for determining the annual interest rate, and that Main Bank's lending of more than was necessary to pay the deficit balance each day was a device to evade the usury laws,

> to have the total amount of interest charged Moody applied to a larger balance through placing more than he needed in his account ....

Moody's expert witness, Larry Rubenstein, testified to calculations of interest he made on both the actual loans and "net loans" of Federal funds made by Main Bank to meet negative balances in Moody's account during the entire loan period of the relationship and during the period following the guaranty. The average annual interest rate under the "net loan" theory, according to Rubenstein, was 12.1%, which made such loans usurious even without including the value of the guaranty as interest.

To accept this argument would be to say that Main Bank should have deposited in the Moody account only so much as was needed to maintain a zero balance, that is, just enough to prevent an overdraft and not so much as to leave funds idle in the account. While it is true that the federal funds placed in the account were, more often than not, more than were actually needed, Moody agreed that, in a normal clearinghouse relationship, the "downstream" bank would have cash in its account with the correspondent "upstream" bank and that a benefit of being a correspondent bank is the presence of large

sums kept on deposit by the downstream bank to meet its "clearing letters" and "cash letters." In fact, Moody admitted that banks customarily expect a borrowing bank to keep a twenty percent compensating balance in a demand account. He further testified that the higher up the banking "stream" a bank is, the greater the daily "swing" (rise and fall of sums in an account). Edwards, testifying on behalf of Main Bank, was asked how these daily loan transactions were accomplished, to which he responded:

A. Well, first there is a calculation to to determine how much, and then there is communication with the bank officer of the Moody Bank and a determination is made and agreement is made, and then there's a book entry made at both banks.

B. And that's on a day-to-day basis with a series of phone calls?

C. Series of phone calls, or some cases there was myself, and Mr. Torregrossa [Moody Bank's head cashier] would visit the bank on a daily basis.

This unrefuted testimony was corroborated by Moody's own admission that his agents were authorized to negotiate daily loans with Main Bank. Edwards also stated that he had no knowledge of any federal fund loan to Moody that was not agreed to by a Moody Bank employee.

■ With regard to the net loan theory, Moody's reliance for support upon what he terms the "line of cases on compensating balances" is misplaced. In *First State Bank of Bedford v. Miller*, 563 S.W.2d 572 (Tex.1978), borrowers who obtained a loan of $70,000 were required to leave $14,000 in a non-interest-bearing account to satisfy post-dated checks for the first two years' interest. The *Miller* court found the true principal was the amount of money to which they had access, $56,000. *Id.* In the present case, no evidence was introduced showing any restrictions placed upon the loan funds deposited by Main Bank in the Moody Bank account. In fact, Edwards testified that, as far as he knew, there was no requirement that Moody Bank maintain

any level of demand deposits. The true principal, and the amount upon which the transaction is tested for usury, here, as in any other usury case, is the actual amount of which the borrower had the use, detention, or forbearance. *Tanner Development Co. v. Ferguson*, 561 S.W.2d 777 (Tex.1977); *Nevels v. Harris*, 129 Tex. 190, 102 S.W.2d 1046 (1937).

Moody's points of error 1, 2, 4, 5, 7 and 8 are overruled.

Moody's points of error 18, 19 and 20 pertain to Special Issue Number Four, in which the jury found that Moody was estopped by ratification or waiver from rescinding the guaranty agreement. Both parties agree that waiver and estoppel are not defenses to usury, *Shook v. Republic National Bank*, 627 S.W.2d 741, 751 (Tex. Civ.App.—Tyler 1981), *reversed, Republicbank Dallas, N.A. v. Shook*, 653 S.W.2d 278 (Tex.1983); *Western Guaranty Loan Co. v. Dean*, 309 S.W.2d 857, 863 (Tex.Civ.App.—Dallas 1957, writ ref'd n.r.e.), and judgment was not entered based on the issue. The jury's finding, adverse to Moody, would have been relevant to Main Bank's defense to duress or undue influence if such had been found in Special Issue One. The points of error are overruled.

Moody's tenth point of error objects to the submission of Special Issue Number One as irrelevant. This issue was submitted by Moody, and he is thus estopped to complain of it. *Corpus Christi National Bank v. Gerdes*, 551 S.W.2d 521 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). The point of error is overruled.

The judgment is affirmed.