REYNALDO G. GARZA, Circuit Judge:
This case involves an appeal from a directed verdict on a counterclaim of usury under the laws of Texas. The judgment of the district court was in favor of plaintiff/counter-defendant Mercedes-Benz Credit Corporation (MBCC) and against defendants/counter-plaintiffs W orld Wide Trucks, Inc. (Worldwide) and Alamo Truck Center, Inc. (Alamo) (collectively “the dealerships”). After a careful review of the record and applicable Texas law, we AFFIRM the decision of the district court.[1]
FACTS
Appellants Worldwide and Alamo were wholesale truck dealerships. In 1977 and 1978, the dealerships entered into wholesale financing agreements with Freightliner Credit Corporation, the predecessor of MBCC, to obtain floor plan financing for the acquisition of trucks. The agreements provided that the dealerships pay MBCC interest on the aggregate amount of credit extended to the dealership at a rate agreed upon between the parties from time to time. The agreements also provided that the dealerships would pay MBCC an additional charge (the “flat charge”) each month for each truck financed. Furthermore, the rate and “flat charge” would be MBCC’s “applicable standard charge and rate, for the class of equipment involved.” As each financed truck was sold, the dealerships were to remit to MBCC the principal loaned on that truck together with the interest accrued to date and the “flat charge”. This arrangement continued through 1986 and into 1987.
Following an internal audit of the dealerships, MBCC filed suit in state district court alleging the dealerships and their guarantors had sold trucks out of trust and failed to remit payments when due. On the day prior to the agreed hearing on *979 MBCC’s motion for a temporary injunction, the dealerships filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. MBCC removed its claims to the bankruptcy court and the bankruptcy judge referred the case to the federal district court. A trustee was appointed and the case finally went to trial in June of 1990.
While denying the allegations of fraud, the dealerships counterclaimed that MBCC violated the Texas usury laws by charging interest above the legal maximum. After all evidence was presented, both parties filed motions for directed verdict on the usury issue, and the district court granted MBCC’s motion. The remaining issues went to the jury, which found in favor of MBCC and assessed a judgment against Worldwide of $5,000,000 and against Alamo of $2,000,000. The dealerships are appealing the final judgment with respect to the directed verdict on the usury issues.
DISCUSSION

Standard of Review

When a trial court grants a directed verdict, it makes the determination that, as a matter of law, “there was no evidence of such quality and weight that fair-minded jurors in the exercise of impartial judgment might reach a different conclusion.” Moore v. Johnson, 568 F.2d 1184 (5th Cir.1978) (citing Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir.1969)). We will review the granting of a directed verdict de novo and thus must, as is required of the trial court, examine the entire record in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party. Charles E. Beard, Inc. v. McDonnell Douglas Corp., 939 F.2d 280, 283 (5th Cir.1991).
Before a directed verdict will be granted, the facts and inferences must point so strongly and overwhelmingly in favor of the moving party that no reasonable jury could arrive at a contrary conclusion. Id. A mere scintilla of evidence is insufficient to present an issue for the jury. Id. Guided by this standard of review, we must determine two central issues m this appeal: 1) did an agreement exist between MBCC and the dealerships regarding the interest rate charged and 2) was the rate charged usurious. If an agreement existed, and the rate was not usurious, then the district judge did not err by granting the directed verdict.
Prior to delving into the issues presented by this appeal, we must consider additionally the unique maxims applicable to claims of usury under Texas law. While we discuss the usury laws themselves infra, we note that due to the penal nature of those laws, the Texas usury statutes are strictly construed. Tygrett v. University Gardens Homeowners’ Ass’n, 687 S.W.2d 481, 484-85 (Tex.App.—Dallas 1985, writ refd n.r.e.) (citing Texas Commerce Bank-Arlington v. Goldring, 665 S.W.2d 103, 104 (Tex.1984)). Any doubt as to the legislative intent to punish the activity complained of is to be resolved in favor of the defendant. Id. at 485 (citing Hight v. Jim Bass Ford, Inc., 552 S.W.2d 490, 491 (Tex. Civ.App.—Austin 1977, writ refd n.r.e.)). If there is any doubt as to the intent of the parties to the transaction alleged to be usurious, a presumption of nonusurious intent will lead a court to resolve such doubt in favor of a finding of legality. Id. (citing Smart v. Tower Land & Investment Co., 597 S.W.2d 333, 340-41 (Tex.1980)). Finally, the existence of usury must be examined within the framework of the entirety of the transaction, considering all the documents interpreted as a whole in light of the circumstances. Id. (citing Spanish Village, Ltd. v. American Mortgage Co., 586 S.W.2d 195, 199 (Tex.Civ.App.—Tyler 1979, writ refd n.r.e.)); Imperial Corp. of America v. Frenchman’s Creek Corp., 453 F.2d 1338, 1344 (5th Cir.1972). While we are thus mindful that our examination of the issues before us is guided by the standards for review in directed verdicts, we are also mindful of the standards specifically guiding the courts in analyzing claims of usury.

Evidence of an Agreement

It is not seriously disputed by MBCC that the agreements at hand do not *980 purport to establish a specific numerical rate of interest; there are no numbers dis-cernable from the face of the agreements. Moreover, there is no explicit reference to a particular index upon which an interest rate could be tied. What MBCC does dispute is the dealerships’ contention that absent a specific numerical designation or index on the face of an alleged agreement, there can be no agreement as to a rate of interest to be charged. To understand fully the saliency of this issue, we examine briefly several fundamental aspects of Texas usury law.
Usury is defined as “interest in excess of the amount allowed by law.” TEX. REV.CIV.STAT.ANN. art. 5069-1.01(a) (Vernon 1987). “When no specified rate [of interest] is agreed upon by the parties,” the rate shall be six percent. TEX.REV. CIV.STAT.ANN. art. 5069-1.03 (Vernon 1987) (emphasis added). If a specified rate is agreed upon, the parties may contract “for any index, formula, or provision of law, by or under which the numerical rate or amount can from time to time be determined....” TEX.REV. CIV.STAT. ANN. art. 5069-1.04(f) (Vernon 1987) {emphasis added). The agreement as to a rate need not be in writing and may be established by a course of conduct. Preston Farm & Ranch Supply v. Bio-Zyme Enterprises, 625 S.W.2d 295, 300 (Tex.1981).
We have little difficulty concluding, after considering the above-recited Texas law, that the dealerships’ initial contention regarding the requirements of an agreement must be rejected as a matter of law. Because there is no requirement that an agreement as to interest be expressed in precise numerical terms, i.e., it may be expressed in terms of reference to an external variable such as a prime rate, and because such an agreement need not be in writing, it is insufficient to contend that no agreement exists here. See Preston, 625 S.W.2d at 300. We turn next to the central question of whether any such agreement existed between these particular parties, whether it be as to a specific numerical rate or to an index as permitted under Texas law.
It is apparent that had the agreements between MBCC and the dealerships stated on their face a specific numerical rate, or that the rate of interest was to be the Bank of America prime rate,[2] there would be little difficulty in finding an agreement as to an interest rate. See TEX.REV.CIV. STAT.ANN. art. 5069-1.04(a), (f) (Vernon 1987) (parties may stipulate to rate and rate may be tied to index). The agreements at issue, however, recite only that the rate will be MBCC’s “applicable standard rate.”[3] Thus, while there is clearly an agreement between the parties that MBCC’s “applicable standard rate” would apply, there is no indication on the face of the agreement as to what that applicable standard rate is. Because Texas law permits parties to establish an agreement as to rates by course of conduct, we must look to the evidence presented to the district court and determine whether, viewing that evidence in the light most favorable to the dealerships, a fair-minded jury could have reached a conclusion different from that of the court below, namely that the parties agreed to the use of a rate tied to the Bank of America prime rate.

Course of Conduct

The dealerships do not contend, and we would be loathe to accept the argument, that the principals involved in the management and ownership of Worldwide and Alamo were anything but experienced busi *981 nesspersons. Thus the district court was not faced with a situation in which parties were not dealing at arm’s length. Instead, the district court heard evidence of an arm’s length course of conduct spanning some nine years of business relations.[4] The evidence established a rather simple course of conduct in which MBCC would send statements reflecting payment due and interest thereon and Worldwide and Alamo would comply therewith by paying the principal due together with the interest. The relationship between the parties was characterized by this systematic monthly conduct throughout its duration.
Significantly, MBCC provided Worldwide and Alamo with a “Wholesale” plan. In that plan, interest was set at IV2 percentage points above Bank of America’s prime rate for new trucks.[5] Furthermore, the interest rate, as indicated above, appeared on the monthly wholesale statements sent to the dealerships. These statements included all interest charges and specified the rate of interest. This fact was stipulated to by all parties in a revised pre-trial order.[6]
It is inconceivable that the knowledge and expertise of those persons operating Worldwide and Alamo was insufficient to comprehend the mathematics involved in deriving the interest rate charged by MBCC. Not surprisingly, the interest rates appearing from these statements corresponded to the rates tied to the Bank of America prime rates listed on the statements and contemplated in the Wholesale agreement. Furthermore, WorldWide’s business manager, Ray Wasek, testified that the interest rate charged by MBCC was common knowledge. Indeed, the evidence suggests the dealerships reported their interest rates on their own financial statements. Moreover, the dealerships paid the interest and principal, apparently with complete knowledge of what they were doing, for more than nine years without ever questioning any aspect of the charges.[7]
The dealerships rely heavily upon the expert testimony of Allen Stinson (Stinson), an accountant who testified that his review of the course of dealings between the parties revealed MBCC had employed eighteen different methods of calculating interest. This evidence, assert the dealerships, precludes any possibility of an agreement as to a rate of interest. Specifically, Stinson delineated on a month-by-month basis the alleged “true interest rate charged” by MBCC. The dealerships point out the inconsistencies revealed by Stinson’s calculations when they are compared to the rates expected had the Bank of America prime been applied. Moreover, the dealerships contend the discrepancies between Stin-son’s figures for Worldwide and those for Alamo, despite identical contracts purporting to apply the same rate of interest, suggest the absence of an agreement.
MBCC directs our attention to the testimony of Stinson elicited on cross examination that indicated the eighteen different methods of calculation resulted in thirteen rates tied to the prime rate index and five rates below that rate. Additionally, the record indicates Stinson’s admission that the figures he generated included the “flat rate” charges, about which more will be *982 said infra. The dealerships presented no evidence, nor does the record suggest the existence of any evidence, that would indicate Worldwide and Alamo had identical floor plans each month. Absent such evidence, it is to be expected that with differing floor plans, differing flat rates would create different rates of interest, assuming, as did Stinson, the flat rates were interest.
We do not efford controlling significance to Stinson’s evidence, even under the favorable standards accorded the dealerships in the directed verdict context. The Texas statutes clearly contemplate that a specific rate of interest be agreed upon, yet those statutes are silent as to the potential methods available to parties to calculate that rate. Moreover, the uncertainty as to the differential effects of inconsistent floor plans and thus “flat rates”, apparently not considered by Stinson in his calculations, serve to cast doubt upon the sufficiency of this evidence. Additionally, we are concerned with the legal sufficiency in the first instance of evidence which speaks to the methods of computing interest as opposed to evidence of the actual rate charged. We do not understand Texas law as requiring us to find the absence of an agreement as to a rate of interest simply because differing methods applied at varying times are shown to have resulted in that rate.[8] Even were the Stinson evidence of a more compelling nature, the evidence in the record to the contrary clearly outweighs it in the directed verdict context.
Given the evidence of the course of conduct between the parties, and the requirement that we examine all of the documents to the transaction, we are satisfied that a fair-minded jury could reach no conclusion other than the parties agreed to a rate of interest tied to the Bank of America prime rate. The testimony of the dealerships’ expert, Stinson, simply does not carry the significance necessary, aside from its questionable evidentiary value as a matter of Texas usury law, to lead us to a contrary conclusion. Thus, the district court properly granted MBCC’s motion for directed verdict as to this issue. We must now examine whether the agreed upon rate of interest was usurious under the laws of Texas.

Evidence of Usury

Finding the district court properly concluded the parties had agreed to a rate of interest, the six percent ceiling applicable absent such an agreement does not bind MBCC in this case. See TEX.REV.CIV. STAT.ANN. art. 5069-1.03. The agreed rate, however, may nevertheless be usurious if it exceeds the ceilings imposed by statute in those situations in which parties agree to a rate of interest.
Texas law provides that once parties agree to a rate of interest and thereby remove themselves from the six percent ceiling of Art. 5069-1.03, the existence of usury is gauged by an eighteen to twenty-four percent ceiling found in Art. 5069-1.04(b)(1). However, before our analysis within the ambit of Art. 5069-1.04 may proceed, we must address two concerns regarding its availability to MBCC brought to the fore by the Dealerships. First, the dealerships point out that Art. 5069-1.04 requires a license and it is undisputed MBCC has no such license. This argument must fail.
Art. 5069-1.04(n)(l) provides in pertinent part:
Any loan made under the authority of this Article that is extended either primarily for personal, family, or household use but not for business, commercial, investment, agricultural or other similar purposes, or primarily for the purchase of a motor vehicle, and that is payable in two or more installments, ... and any person except a bank or savings and loan association engaged in that business shall obtain a license....
TEX.REV.CIV.STAT.ANN. art. 5069-1.04(n)(l) (emphasis added)
The plain language of the statute excludes persons such as MBCC except in the *983 instance of a loan made for the purchase of a motor vehicle, such loan being payable in two or more installments. It is undisputed that the dealerships were required to pay the entire balance owing on each vehicle sold as soon as the sale occurred. Thus the transactions involved here do not constitute installment loans and MBCC is not bound by the requirements of Art. 5069-1.04(n)(l).[9]
The second contention of the dealerships is that MBCC may not rely upon the eighteen to twenty-four percent ceilings of Art. 5069-1.04(b) because at the time the agreements were entered into, that statute permitted only a ten percent ceiling. Texas courts recognize the settled nature of the legal principle “that the usurious nature of a contract is to be determined at the time of its inception.” Reagan v. City National Bank, N.A., 714 S.W.2d 425, 428 (Tex.App.—Fort Worth 1986, writ refd n.r.e.). Thus, should the legislature make a subsequent change in the maximum rate of interest allowable, the fact that parties contracted for a usurious rate is unchanged. Arguelles v. Kaplan, 736 S.W.2d 782, 786 (Tex.App.—Corpus Christi 1987, writ refd n.r.e.). But see 15 SAMUEL WILLISTON, WILLI-STON ON CONTRACTS 188 (Walter H.E. Jaeger ed., 3rd ed. 1972) (statutes repealing usury laws construed to validate pre-exist-ing contract usurious when made). An exception to this rule occurs when the parties renew an otherwise usurious contract after the legislature has enacted new maximum rates of interest. See Reagan, 714 S.W.2d at 428 (note not usurious unless terms renewed or extended). Thus, unless MBCC’s contract was annually renewable, it will be bound by the ten percent ceiling under the previous version of Art. 5069-1.04.
In their supplemental brief, the dealerships concede that on the face of the Wholesale agreements, a continuing line of credit adjusted annually to conform to law is presented. However, they argue the course of dealing between the parties suggests a different scenario. The dealerships argue a series of independent, singular transactions revolving around each truck sale preclude a finding of an annually renewable line of credit. MBCC, for its part, focuses our attention to the contractual provision conceded by the dealerships which states “[MBCC’s] continuing credit account with [the dealerships] ... shall be adjusted at the end of such calendar year to the extent required to conform to applicable law and this agreement.”
Unlike the question of the existence of an agreement as to a rate of interest where we looked to the course of conduct to discern that not readily discernable, we see no reason to employ such an analysis here where the issue of renewability is readily apparent from the face of the agreements. The language of the agreements is clear and this much is conceded by the dealerships. Indeed, this is a purely gratuitous concession on the part of the dealerships because the record definitively reflects all parties to the suit stipulated to the fact of a continuing line of credit in the revised pre-trial order.[10] Thus we conclude MBCC may invoke the increased ceilings under the Texas statutes, its line of credit annually renewable as per its agreements with the dealerships.
Finding no merit in the issues presented by the dealerships regarding the application of Art. 5069-1.04 to the transactions involved, we now address the sub *984 stantive question of whether or not the rates agreed to were in fact usurious.
It is clear from our analysis of Texas law and from our reading of the record, that the rate agreed upon, tied to the Bank of America prime rate, did not result in usurious charges of interest. Indeed, the record reflects the rates charged seldom even approached the eighteen percent ceiling in Art. 5069-1.04. The dealerships nevertheless argue that MBCC charged usurious rates because the “flat charge” attending the sale of each truck should be calculated as interest and, when so done, the actual amount of interest charged was usurious.
The evidence showed the “flat charge” MBCC charged on each truck equalled one-fourteenth of one percent per month. The dealerships’ expert, Allen Stinson, offered testimony indicating hypothetically that were a truck to be received on the last day of a particular month and sold on the first day of the following month, a “flat charge” would be charged for each of those months despite the fact that the dealerships were in possession of the trucks for only two days. This practice, according to Stinson, reflected an effective annual interest rate of 52.14%. There is no evidence of such a transaction occurring, but more importantly, there is no evidence suggesting that the “flat charge” was assessed on a daily, rather than a monthly basis as the dealerships contend. Thus, had the evidence shown MBCC charged its “flat charge”, for example, on the last day of the month, and then on the first twenty-nine days of the following month, i.e., that it charged its “flat charge” thirty times over a two month period instead of only two times during the same period (on a “monthly” basis), Stin-son’s hypothetical calculations regarding the effective rate of interest would carry weight. This, however, simply was not the case. The agreements between the parties contemplated the charging of the flat rate no more than twelve times a year, that is, on a monthly basis. There is no evidence in the record suggesting that so applied, the “flat charge” resulted in usurious charges of interest.
Because we have concluded that even were the “flat charges” deemed interest the transactions are not usurious, we need not address the issue of their status as interest in the first instance. We are thus left with the final contention of the dealerships that the approximately seventy-six transactions occurring in 1987 are usurious.
The dealerships argue that because the contracts were not renewable, there was no agreement as to interest for 1987, and absent such an agreement, the rates charged were usurious. We have already concluded that the contracts provided for an annually renewable line of credit. Furthermore, we would find little difficulty in concluding the course of conduct transpiring in 1987, virtually identical to that of the previous years of the relationships, establish the existence of an agreement as to a rate of interest to be charged. Finally, we note that the evidence suggested renewal negotiations had in fact begun but were not completed because MBCC discovered the fraud committed by the dealerships and severed the relations. We thus reject the dealerships’ contention that the parties operated outside the framework of an agreement in 1987. Because our previous analyses reveal the transactions did not violate Texas usury law, we further reject the contention that the 1987 transactions were in violation of that law.
CONCLUSION
Viewing the evidence in the light most favorable to the dealerships, we have found the existence of an agreement as to interest and the absence of any usurious charges of interest. Thus we conclude the district court did not err when it granted MBCC’s motion for directed verdict as to the issue of usury. The decision of the district court is therefore
AFFIRMED.

. Although it stated it would do so, the district court made no specific findings of fact or conclusions of law. Thus our examination has been particularly rigorous in this voluminous appeal.

. The dealerships appear to make much of the fact that Bank of America ceased to have a "prime rate” as such effective April 23, 1984. Instead, as of May 1984, the Bank of America utilized a "reference rate”. We note that the dealerships' own expert witness, Allen Stinson, submitted trial exhibits bearing a notation indicating MBCC followed the "reference rate" as soon as it went into effect. Absent evidence suggesting anything more than nominal differences between the "prime” and "reference” rates, we discern no legal significance to the dealerships’ contentions regarding this point.

. As to the existence of an agreement to charge the MBCC "applicable standard rate”, there is no dispute. The question of whether there was ever any agreement as to what this rate would be is, however, disputed.

. Although the parties’ relationship spanned at least nine years, the dealerships counterclaimed only for alleged usurious transactions which occurred during the period from 1983 through 1987, the applicable limitations period under the Texas Credit Code.

. The plan also provided for three percentage points after maturity on those trucks as well as three points for used trucks.

. The order provided:
9) Each month, WORLDWIDE and ALAMO received from MERCEDES CREDIT WHOLESALE STATEMENTS reflecting dollar amounts of interest charged and a reference to a prime rate which was provided pursuant to the WHOLESALE FINANCING AGREEMENT for "the convenience of the parties."

. This is especially so in the area of automotive floor plan financing, an area which has met troubled financial times with myriad creative financing arrangements at all levels of a transaction.

.We do not mean to intimate the dealerships have in some sense accepted by their behavior a rate of interest that is usurious; this would be contrary to Texas law. See Hardwick v. Austin Gallery, 779 S.W.2d 438, 448 (Tex.App.—Austin 1989, writ denied) (opinion on rehearing) (penalties recoverable for usury even if usurious rates voluntarily paid). Rather, we view the dealerships’ behavior merely as evidence of course of conduct tending to show the existence of an agreement as to a rate of interest.

. Our reasoning on this issue necessarily precludes any inquiry into the dealerships assertions that the transactions in this case are governed by Texas statutes concerning installment loans. Moreover, we express no opinion as to whether an entity such as MBCC is bound by the clause in Art. 5069-1.04(n)(l) relating to motor vehicles, having found the inapplicability of the clause based upon its requirement of an installment loan.

. In the revised pre-trial order, the parties also stipulated that end-of-year adjustments of the interest rates were never made. This does not change the fact of renewability. Instead, it merely reflects that the same rate was followed year to year. Indeed, the continuity in the rate of interest charged facilitated our earlier course of dealing analysis leading us to conclude the evidence overwhelmingly supported the conclusion of the existence of an agreement as to interest.