PRESTON FARM & RANCH SUPPLY,
INC., et al., Petitioners,

v.

BIO–ZYME ENTERPRISES,
Respondents.

No. C–379.

Supreme Court of Texas.

Nov. 25, 1981.

Rehearing Denied Jan. 6, 1982.

Nance, Caston & Nall, David Stagner, Denison, for petitioners.

The Fiedler Firm, Donald A. Muncy, Richardson, The Carlton Firm, Ron V. Berkowitz, Dallas, for respondents.

SPEARS, Justice.

This is a suit initiated by Bio-Zyme Enterprises against Ken Vanderhoof and Preston Farm & Ranch Supply, Inc. on a sworn account to collect a debt. The defendants counterclaimed, alleging usury. The primary issue before the court is whether the evidence supported a finding that Preston Farm and its owner, Ken Vanderhoof, agreed to pay interest on the account. The trial court found that such an agreement existed and rendered judgment for the plaintiff Bio-Zyme on the debt, but deducted from its judgment against Vanderhoof an amount equal to twice the interest charged as a penalty for usury. The court of civil appeals affirmed. 615 S.W.2d 258. We affirm the judgment of the court of civil appeals.

Bio-Zyme is a manufacturer of livestock feeds. Ken Vanderhoof was a retailer of feeds and other merchandise. In April of 1975, Bio-Zyme began selling stock feed to Vanderhoof on open account. The invoices sent along with the shipments stated the terms only as "Chg." Bio-Zyme would then send to Vanderhoof a monthly statement showing the invoice numbers of the items purchased, the charges, the credits to Vanderhoof's account, and his balance. At the bottom of each statement, these printed sentences appeared:

> No finance or carrying charge is made on accounts paid within thirty days of purchase. Accounts not paid within 30 days will on our billing date (the 26th day of each month) be charged 1% each month which is 12% annual rate.

Sales to Vanderhoof individually continued until October of 1975 when he informed Bio-Zyme of his incorporation as Preston Farm & Ranch Supply Co. By this time, eight sales from Bio-Zyme to Vanderhoof had been made and seven monthly statements had been sent, showing that service charges were imposed four times. On each monthly statement in which a service charge was imposed, the words "SERVICE CHARGE" were conspicuously stamped in the column where an invoice number would normally appear, and the amount of the service charge appeared in the charge column.

After Vanderhoof informed Bio-Zyme of his incorporation, the sales continued, except that the billing was then made to Preston Farm & Ranch Supply Co. as requested by Vanderhoof. Business relations continued between the parties through April of 1976. A total of fourteen invoices, nine service charges and numerous payments and credits are reflected in the monthly statements sent to the corporation. By April 1976, the statements showed an unpaid balance of $31,321.56 owed to Bio-Zyme including $14,910.16 incurred by Vanderhoof prior to incorporation. This latter debt had been posted to the Preston Farm monthly statements.

Bio-Zyme brought suit to recover on the unpaid invoices. Vanderhoof and Preston Farm counterclaimed for usury and prayed for recovery of twice the amount of the service charges, attorney's fees, and for forfeiture of the original debt. The counterclaim invoked the provisions of art. 5069–1.-06 Tex.Rev.Civ.Stat.Ann.[1] On February 4, 1980, after a non-jury trial, judgment was rendered (1) that Bio-Zyme recover from Vanderhoof on the unpaid invoices incurred by him individually less double the service charges imposed, and (2) that Bio-Zyme recover from Preston Farm the amount of the unpaid invoices plus service charges since the charges did not exceed the 18% allowed to be charged to corporations under art. 1302–2.09. The trial court found that Van-

derhoof and Preston Farm had agreed to pay a 1% per month service charge, and that the agreed charge, amounting to 12% per annum, was two percent higher than the maximum rate (10%) allowed by article 5069–1.02 to be charged individuals. Thus, as to Vanderhoof, the court awarded usury penalties amounting to twice the interest charged under § 1.06(1), but did not impose the statutory forfeiture of principal penalties sought for double usury under § 1.06(2).

The court of civil appeals affirmed, holding that Vanderhoof and Preston Farm contracted to pay interest at the rate of 12% per annum by virtue of § 2.207 Tex.Bus. Comm.Code.[2]

Article 5069–1.02 as it applied at the times pertinent to this case set the maximum rate of interest which a creditor may charge on a non-written contract at 10% per annum.[3] Where the parties do not agree upon an interest charge on an open account, an obligation to pay interest at the rate of 6% per annum arises by implication of law. Art. 5069–1.03.[4] This six percent charge is the maximum rate allowed by law on an open account where the parties do not agree to another amount. *Houston Sash & Door v. Heaner*, 577 S.W.2d 217 (Tex.1979).

Any person charging more than the maximum legal rate allowed by art. 5069–1.02 incurs the penalties imposed by art. 5069–1.-

---

**1.** Article 5069–1.06 provides in part:

(1) Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor twice the amount of interest contracted for, charged or received, and reasonable attorney fees fixed by the court. . . . .

(2) Any person who contracts for, charges or receives interest which is in excess of double the amount of interest allowed by this Subtitle shall forfeit as an additional penalty, all principal as well as interest and all other charges and shall pay reasonable attorney fees set by the court; . . . .

All statutory references are to Vernon's Texas Revised Civil Statutes Annotated.

**2.** All references to the Code are to the Texas Business Commercial Code Annotated.

**3.** Different rates of interest now apply. *See* 1981 Tex.Sess.Law Serv. Ch. 111 at 275. (To be codified as art. 5069–1.04(f)).

**4.** Article 5069–1.03 as it was effective prior to August 27, 1979 provided:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all written contracts ascertaining the sum payable, from and after the time when the sum is due and payable; and on all open accounts, from the first day of January after the same are made.

Article 5069–1.03 now provides:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

06. The statute provides for different penalties for charging twice the legal rate than those imposed for charging interest which exceeds the legal rate but does not double it; therefore, a determination of what rate of interest if any was agreed upon by the parties is necessary to ascertain which penalties Vanderhoof was entitled to receive.

The question of whether an agreement was reached by the parties is generally a question of fact where the existence of the agreement is disputed. *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607 (Tex. 1972); *Keesey v. Old*, 82 Tex. 22, 17 S.W. 928 (1891). In the present case, the trial judge found as a fact that Vanderhoof and Preston Farm both agreed to pay interest on the account with Bio-Zyme at the rate of one percent per month. Thus, the question before this court on appeal is whether there is any evidence that supports that finding. *Stodghill v. Tex. Employers' Ins. Ass'n*, 582 S.W.2d 102 (Tex.1979); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). We conclude there is evidence to support a finding of an agreement to pay interest.

The transaction involved here was a sale of goods. Thus, the sales provisions of article 2 of the Texas Business and Commerce Code apply. Section 2.204 of the code provides: "(a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Even prior to the enactment of the Code it was recognized in Texas that a contract could be formed by conduct. Such a contract is one implied in fact.

> A contract implied in fact is one in which, under the circumstances, the acts of the parties are such as to indicate according to the ordinary course of dealing and the common understanding of men a mutual intention to contract, as where one accepts the tendered service of another under circumstances justifying the inference that such other expected to be paid for such services.... A contract implied from the facts and circumstances in evidence is as binding as would be an expressed one.

*Marr-Piper Co. v. Bullis*, 1 S.W.2d 572, 575 (Tex.Comm.App.1928, judgment adopted); *see also Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, *supra*. The classic example of an implied contract from course of dealing under the Uniform Commercial Code occurs where a buyer accepts delivery of goods with knowledge that the goods were offered at a certain price; in accepting the goods the buyer impliedly agrees to pay the specified price. *See* Williston on Sales § 7–2 p. 199 (4th ed. 1973).

In the present case, there is evidence of a course of conduct which gave rise to an agreement to pay interest. The record reflects that the parties had extensive dealings with one another. Altogether twenty separate sales were made from Bio-Zyme to Vanderhoof either individually or as Preston Farm. The sales continued for over a year, and Vanderhoof received a statement each month containing the service charge provision. Many of the statements plainly and conspicuously stated that service charges had been imposed. Vanderhoof continued his credit purchases and he continued to accept the goods that Bio-Zyme shipped. No objections to the service charges in question were ever made. To the contrary, Preston Farm paid service charges on Vanderhoof's debt. Moreover, at trial, Vanderhoof admitted that he agreed with the charges to his account until "very, very, recently" when he found out too much interest was being charged. We liken the present transaction to that of goods accepted with knowledge that they were offered at a certain price. From this course of conduct, the court could conclude that Vanderhoof knew or should have known that the service charge was being imposed. By his continued purchases and payments he at least impliedly agreed to pay the specified interest.

The parties involved here were both merchants as that term is defined by the

Code.[5] The Code assumes that transactions between professionals in a given field require special and clear rules which may not apply to a casual or inexperienced seller or buyer. Code § 2.104 comment 1. Because of the reasonable expectation of business knowledge, the duty owed by the merchant is higher than that of the nonmerchant. Williston, supra at 281. Thus, the same course of conduct which might establish a contract between merchants might be insufficient to evidence a consumer contract.

■ The court of civil appeals based its conclusion that an agreement to pay interest was established upon section 2.207 of the Texas Business and Commerce Code. We disagree with that rationale. That section provides as follows:

> § 2.207. Additional Terms in Acceptance or Confirmation
>
> (a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> (1) the offer expressly limits accept-to the terms of the offer;
>
> (2) they materially alter it; or
>
> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (c) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In

such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

Section 2.207 speaks to two situations. The first situation is where an offer is made and a written acceptance is sent in return, but the acceptance purports to add additional terms to the contract. Code § 2.207, comment 1. A second situation to which the section applies is where the parties come to an agreement by some means other than writing and then one party formalizes the agreement in a written memorandum confirming the agreement. *Id.* The monthly statements involved in this case were neither letters of acceptance nor confirmations of an informal agreement. These statements were merely furnished as billing to show Vanderhoof the total amount owed. The basic contract for the sale of goods had already been formed and executed.

Courts and scholars have questioned whether this section can apply at all to a sale in which the goods have already been shipped and accepted and a memorandum such as an invoice or statement altering the terms is sent contemporaneously with or subsequent to the shipment of the goods. *See Roto-Lith Ltd. v. Bartlett Co.,* 297 F.2d 497 (1st Cir. 1962); *Rite Fabrics, Inc. v. Stafford-Higgins Co.,* 366 F.Supp. 1 (S.D.N.Y.1973); *Trust Co. Bank v. Barret Dist. Co.,* 459 F.Supp. 959 (S.D.Ind.1978); Williston, *supra* at 286. "Certainly, not every written communication after an oral agreement need be characterized as a confirmation. Were it otherwise, it would be impossible to determine where the process of confirming ended." 3 Duesenberg & King, Sales and Bulk Transfers 3–90 (Bender's U.C.C. Service 1980). *See also Southwest Engineering Co. v. Martin Tractor Co.,* 205 Kan. 684, 473 P.2d 18 (1970). We hold that the process of

---

5. Section 2.104 Tex.Bus.Comm.Code provides:

(a) "merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment or an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

acceptance and confirmation to which section 2.207 is addressed stops short of a monthly statement sent after the goods have been shipped. Consequently, the mere failure to object within a reasonable time, without more, would not, as the court of civil appeals holds, establish an agreement. The provisions imposing a service charge served only to propose to Vanderhoof the terms upon which credit would be extended. By his conduct in making continued purchases and payments, Vanderhoof accepted this proposal.

Vanderhoof argues that the conduct evidenced in this case could not as a matter of law establish a contract and cites our decision in *Houston Sash & Door Co. v. Heaner, supra*, 577 S.W.2d 217, in support of his argument. As in the instant case, *Houston Sash* involved an exchange of invoices and a long course of dealings. We held that double usury penalties applied to Houston Sash & Door Co. because that company had charged interest upon an open account during the interest free period provided for in article 5069–1.03 as it read at that time. However, the question of whether an agreement existed to pay the interest contained in the invoices sent by Houston Sash was never presented to this court by the parties in that case. Thus, in *Houston Sash*, we did not decide what conduct is necessary to establish an agreement to pay interest on an open account. Likewise, in the case of *Watson v. Cargill, Inc., Nutrena Division*, 573 S.W.2d 35 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.), cited by Vanderhoof, the contention that an agreement to pay interest arose from a course of conduct was never made.

■ Vanderhoof and Preston Farm also argue that any agreement which arose by operation of sections 2.204 or 2.207 would not be sufficient to negate the applicability of article 5069–1.03. They contend that a *written* contract is necessary to avoid the applicability of the six percent per annum rate provided by that statute, citing *El Paso Environmental Systems, Inc. v. Filtronics, Inc.*, 609 S.W.2d 810 (Tex.Civ.App.—El Paso 1980, writ ref'd n. r. e.). The basis for the holding of *Filtronics* and for our refusal of the writ of error, no reversible error, was that the defendant, El Paso Environmental Systems, Inc., never raised the defense of usury by affirmative pleadings. In language unnecessary to the decision of that case, the court of civil appeals indicated that a contract formed by course of conduct is inadequate to avoid the application of 5069–1.03 because such an agreement to pay interest must be in writing. However, article 5069–1.03 does not make any requirement of writing. The statute requires only that the parties *agree* to some specified rate of interest in order to take the agreement out of the statute. The language in *Filtronics* requiring a written contract in order to avoid the provisions of 5069–1.03 is disapproved.

■ Vanderhoof also contends that no contract could have been formed by the course of conduct here because Vanderhoof himself never saw the statements in question, but instead these matters were handled by his bookkeeper. We regard it as well settled that if an agent's acts are within the scope of his authority, then notice to the agent of matters over which the agent has authority is deemed notice to the principal. *Victory v. State*, 138 Tex. 285, 158 S.W.2d 760 (1942). Here, Vanderhoof testified he placed his bookkeeper in charge of all payments made on his accounts. The bookkeeper was authorized to deal with the statements and make any payments which might be necessary because of the statements. Under these circumstances, any notice which the statements gave to Vanderhoof's bookkeeper will be imputed to Vanderhoof himself.

The judgment of the court of civil appeals is affirmed.