# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00172-CV

**International Metal Sales, Inc., Appellant**

**v.**

**Global Steel Corporation and Global Steel Corp., Appellees**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT
NO. 05-566-C368, HONORABLE BURT CARNES, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

International Metal Sales, Inc. (IMS) appeals a district court judgment dismissing, based on a forum-selection clause, claims it had asserted against appellees Global Steel Corporation and Global Steel Corp. IMS brings four issues on appeal in which it argues that the evidence is insufficient to support a finding or conclusion that it ever formed a contract containing the forum-selection clause. In the alternative, IMS urges that clause is unenforceable and does not extend to all of IMS's claims. We will reverse the judgment and remand.

## BACKGROUND

Appellant IMS is a Texas corporation with its principal place of business in Georgetown, Texas. IMS's president and sole employee is Kimberly Lerch. Appellee Global Steel *Corporation* was incorporated in Pennsylvania in 1990 and has its principal place of business in Willow Grove, Pennsylvania. Appellee Global Steel *Corp.*, on the other hand, was

incorporated in Michigan in 2003, although it operates out of the same location as Global Steel Corporation, paying Global Steel Corporation for use of office space and employees pursuant to a management services agreement. The sole shareholders and officers of both Global Steel entities are Robert Lutsky and Jeffery Falcoff. To the extent the distinction becomes relevant, we will refer to Global Steel Corporation (the one incorporated in Pennsylvania) as "Global Steel-PA" and Global Steel Corp. (the Michigan corporation) as "Global Steel-MI."

IMS and the Global Steel entities are engaged in the business of distributing steel products. The steel in which they typically trade is sold in a rolled or coiled form suitable for ultimate use by manufacturers or fabricators of steel products like shelving, building studs, and automobile parts. As described by Ms. Lerch during her testimony below, the parties each act essentially as a middleman, buying steel products from vendors or other distributors for resale to other distributors and end users. Lerch added that the product inventories are typically located in public warehouses at which the seller has an account. Lutsky testified that, at all relevant times, Global Steel-MI owned and traded in steel inventories located exclusively in Michigan warehouses, while transactions involving steel located anywhere else went through Global Steel-PA. He explained that this arrangement was designed to yield certain tax benefits.

Lerch testified that IMS had a business relationship with Lutsky and Falcoff dating back to the 1990s and that IMS had traded directly with Global Steel-PA since around 2001. She acknowledged that IMS also had made numerous purchases from Global Steel-MI since that company's 2003 incorporation, although she claimed that she had been unaware of the existence of two separate Global Steel entities until after litigation had begun. According to Lerch, IMS and

2

"Global Steel" did business "on different levels and with different vendors and customers" and would buy and sell steel to each other for resale to their respective customers. Lerch further testified that around 2003, IMS also began serving as a sale or purchase agent for "Global Steel," arranging transactions directly between "Global Steel" and IMS customers, in exchange for which IMS would receive a commission.

Disputes arose and IMS ultimately sued both Global Steel entities. In its live pleading, IMS alleges essentially three sets of factual allegations that it attributes to both entities under a single-business-enterprise theory:

- ***The defective steel allegation***. IMS alleges that it purchased "substantial amounts of steel products from the Defendant [i.e., the alleged "Global Steel" single-business enterprise] which, upon delivery, were determined, by Plaintiff, to be defective, deficient, or otherwise not as had been represented by Defendant." IMS pleads that "Defendant acknowledged that these products were not as offered or as ordered and prevailed upon Plaintiff to retain the non-conforming products in Plaintiff's inventory for reapplication." IMS alleges that it agreed to do so "but only upon Defendant's promise that Defendant would replace non-conforming items, would sell and deliver additional products, and reduce purchase price on future orders from Plaintiff." IMS further pleads that "Defendant" later reneged on its promises and that it incurred freight, storage, and processing charges, in addition to being left with "thousands of dollars of non-conforming steel products, for which there was very limited resale or scrap market."

- ***The credit line allegation***. IMS alleges that in early 2005, Lutsky requested that IMS obtain a letter of credit to secure its credit purchases. IMS obtained a letter of credit from State Bank in Austin in the amount of $200,000, with "Global Steel Corporation" (i.e., the legal name of Global Steel-PA) as the beneficiary. IMS complains that nearly all of approximately $194,000 in draws thereafter were made by Global Steel Corp. (i.e., Global Steel-MI) "without the prior knowledge or approval of either Plaintiff or State Bank."

- ***The unpaid commissions allegation***. IMS alleges that "Defendant" failed to pay it agreed-upon commissions due on sales IMS generated for it as its broker. In addition to the commission amounts, IMS complains that it is entitled to reimbursement for transportation and storage costs it incurred on "Defendant's" behalf.

3

Based on these allegations, IMS asserted causes of action for DTPA violations, fraud, breach of contract, and breach of warranty. It sought actual damages, additional and exemplary damages, and attorney's fees.

Both Global Steel-PA and Global Steel-MI moved to dismiss IMS's suit based on a forum-selection clause contained in substantively identical invoices the entities had used in connection with steel sales to IMS.[1] Following a series of evidentiary hearings, the district court

[1] IMS originally filed its suit in June 2005 against "Global Steel Corporation" (i.e., the legal name of Global Steel-PA). Global Steel-PA filed a motion to dismiss, relying on the forum-selection clause contained in the invoices it used. In support, it presented an affidavit from Lutsky in which he averred that "Global Steel" had issued "the 3 invoices in question in this case." An evidentiary hearing was held, at the conclusion of which the district court denied the motion. Although the district court did not make findings of fact and conclusions of law, the reporter's record reflects that a primary focus of the hearing was whether the transactions in dispute were for the sale of goods of less than $50,000 in value, so as to come within the protections of former section 35.53 of the business and commerce code. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 570, § 14, 1993 Tex. Gen. Laws 2099, 2145, *repealed and recodified by* Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 1964-65 (current version at Tex. Bus. & Com. Code Ann. § 273.002 (West 2009)) (if contract for sale of goods for $50,000 or less "contains a provision making the contract or any conflict arising under the contract subject to the laws of another state, to litigation in the courts of another state, or to arbitration in another state, the provisions must be conspicuously in . . . writing that is bold-faced, capitalized, underlined, or otherwise set out in such a manner that a reasonable person against whom the provision may operate would notice" and making non-compliant provisions voidable). During this hearing, IMS took the position, and Lerch testified, that none of the transactions at issue at the time were for values exceeding $50,000.

Thereafter, Global Steel-*MI* sued IMS for breach of contract in Pennsylvania state court. Global Steel-MI alleged that IMS had breached its obligation to pay the same three invoices that were already at issue in IMS's Travis County suit against Global Steel-PA. In fact, as we will discuss below, the three invoices, which reflect the purchases underlying IMS's "defective steel" allegation, were each in the name of "Global Steel Corp." (i.e., Global Steel-MI), and reflected the sale of steel located in Michigan. IMS then added Global Steel-MI to its Williamson County suit, alleged that both Global Steel entities were liable under a single-business-enterprise theory, and sought an anti-suit injunction to bar Global Steel-MI from further prosecuting its Pennsylvania action. Global Steel-MI then filed a motion to dismiss in the Williamson County litigation based on the forum selection clause contained in the invoices, as well as a plea to abate

4

granted the motion and dismissed IMS's suit.[2]  After unsuccessfully moving for new trial, IMS

brought this appeal to challenge the district court's judgment of dismissal.

**ANALYSIS**

The district court's judgment does not state its specific grounds for dismissal,

nor did the court make findings of fact and conclusions of law.[3]  However, as the parties seem to

acknowledge, the district court's judgment of dismissal necessarily rests upon the legal conclusions

that IMS is bound to the contractual forum-selection clause on which the Global Steel entities rely

and that the provision governs each of IMS's claims.  In its first two issues, IMS challenges whether

the evidence is legally or factually sufficient to support the finding or conclusion that it ever formed

---

the Williamson County litigation pending the disposition of its Pennsylvania action.  A hearing was held, after which the district court granted a temporary anti-suit injunction and denied Global Steel-MI's motion to dismiss and plea in abatement.

[2]  The district court ultimately granted a joint motion of Global Steel-PA and -MI to reconsider the district court's previous rulings on their dismissal motions.  The motion emphasized amended pleadings and evidence tending to demonstrate that the value of sales in controversy exceeded $50,000, which, the Global Steel entities urged, negated the protections of business and commerce code former section 35.53.  Another evidentiary hearing was held, at the conclusion of which the district court granted the motion to reconsider and dismissed all of IMS's claims.

[3]  IMS requested that the district court prepare findings of fact and conclusions of law, and later filed a notice of past-due findings, but the district court declined to make them.  Although IMS urges that its efforts to obtain findings and conclusions impacts our standard of review, as discussed below, we do not understand it to be claiming any error in the district court's refusal to make the findings.  To the extent it does, we note that the district court was not required to make findings and conclusions concerning its pretrial dismissal rulings.  *See CMS Partners, Ltd. v. Plumrose USA, Inc.*, 101 S.W.3d 730, 736 (Tex. App.—Texarkana 2003, no pet.); *see also* Tex. R. Civ. P. 296 (requirement that trial court enter findings of fact and conclusions of law applies "[i]n any case *tried* in the district or county court without a jury") (emphasis added); *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 443 (Tex. 1997); *Awde v. Dabeit*, 938 S.W.2d 31, 33 (Tex. 1997).

a contract containing the forum-selection clause. In the alternative, in its third issue, IMS urges that the clause is unenforceable. Finally, in its fourth issue, IMS argues in the further alternative that if it is bound by the forum-selection clause, the provision does not extend to all of its claims. IMS's first two issues are dispositive.

As the parties seeking to enforce a contractual forum-selection provision, each of the Global Steel entities had the initial burden of establishing that it and IMS had agreed to an exclusive forum and that the agreement applied to IMS's claims. *See Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 611-12 & n.6 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999) (a party seeking to compel arbitration—a type of forum-selection provision—must establish the existence of an arbitration agreement and show that the claims raised fall within the scope of that agreement).[4] Assuming the party seeking enforcement establishes these prerequisites, the burden shifts to the party opposing enforcement to make a "strong showing" overcoming the prima facie validity of the forum-selection clause. *Phoenix Network Techs. (Europe) Ltd.*, 177 S.W.3d at 611 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 15 (1972)). Assuming the parties agreed to it and it applies to the claims in question, a forum-selection clause must be enforced unless "the party opposing enforcement of the clause can clearly show that (1) enforcement would be unreasonable or unjust, (2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene

---

[4] A motion to dismiss, such as the Global Steel entities each filed here, is an appropriate procedural vehicle for enforcing a forum-selection clause. *See Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 610 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Accelerated Christian Educ., Inc. v. Oracle Corp.*, 925 S.W.2d 66, 70 (Tex. App.—Dallas 1996, no writ)).

a strong public policy of the forum where the suit was brought, or (4) the selected forum would be seriously inconvenient for trial." *In re Lyon Fin. Servs.*, 257 S.W.3d 228, 231-32 (Tex. 2008) (per curiam); *see In re Automated Collection Techs.*, 156 S.W.3d 557, 559 (Tex. 2004) (per curiam) (enforcement of forum-selection clause is "mandatory" unless party opposing enforcement meets this burden).

We review a trial court's decision to enforce or not enforce a forum-selection clause for abuse of discretion. *In re Lyon Fin. Servs.*, 257 S.W.3d at 231-32. However, to the extent that our review involves questions of law, the standard of review is de novo. *Southwest Intelecom, Inc. d/b/a Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324-25 (Tex. App.—Austin 1999, pet. denied). This is so because a "trial court has no 'discretion' in determining what the law is or applying the law to the facts," *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992), and, therefore, "abuses its discretion" if it misinterprets or misapplies the law. *Perry Homes v. Cull*, 258 S.W.3d 580, 598 (Tex. 2008); *Walker*, 827 S.W.2d at 840.

In the absence of findings of fact and conclusions of law, we infer all fact findings necessary to support the judgment under any legal theory that is supported by the evidence. *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 870 (Tex. App.—Austin 2008, no pet.) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-95 (Tex. 2002)); *Franklin v. Donoho*, 774 S.W.2d 308, 311 (Tex. App.—Austin 1989, no writ), *overruled on other grounds*, *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 434 (Tex. 2000).[5] Where, as here, a reporter's record has been prepared,

---

[5] Relying on rule 298 of the rules of civil procedure, IMS argues that because it proposed fact findings that the district court declined to adopt, "no findings or conclusions can be deemed or presumed." Rule 298, however, applies only "[a]fter the court files original findings of fact and

7

a party may challenge the legal and factual sufficiency of the evidence supporting these implied findings. *BMC Software Belg., N.V.*, 83 S.W.3d at 795.

When a party challenges the legal sufficiency of the evidence supporting a finding on which the opposing party had the burden of proof, it must demonstrate: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review of the evidence, a court must consider all of the evidence in the light most favorable to the fact finding and indulge every reasonable inference that would support it. *Id.* at 822.

When a party challenges the factual sufficiency of the evidence supporting an adverse finding on which the opposing party had the burden of proof, we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the finding should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

---

conclusions of law," and governs the effect of a trial court's failure to make "additional findings or conclusions" timely requested by a party. Tex. R. Civ. P. 298. Where, as here, the trial court does not make original findings or conclusions, the presumptions in favor of a judgment's regularity dictate the standard of review we describe above. *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 251-52 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

During the hearings, Lerch admitted that IMS had made 227 steel purchases from the Global Steel entities between 2003 and the inception of the litigation. With each of these purchases, Lerch further conceded, IMS received an invoice under the letterhead of either Global Steel-PA or Global Steel-MI that contained the forum-selection clause on which the Global Steel entities now rely. These purchases, Lerch acknowledged, included all of those from which IMS's "defective steel" and "credit line" allegations arose. However, Lerch denied that IMS received any invoices in connection with the transactions underlying its "unpaid commissions" allegation because, she explained, in those transactions the Global Steel entity or entities invoiced the customer directly.

Copies of the three invoices underlying IMS's "defective steel" claim—each of which was under Global Steel-MI letterhead—were in evidence.[6] At the bottom of each invoice was stated, in approximately eight or nine-point type, "SUBJECT TO TERMS AND CONDITIONS ON REVERSE SIDE." The terms and conditions on the invoice's reverse side consisted of fourteen numbered paragraphs prefaced by the following statement centered at the top of the page, "**IT IS AGREED BY THE PARTIES THAT THIS TRANSACTION IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS**." Paragraph six of the terms and conditions contained the forum-selection clause at issue here:

> **6.     ENFORCEMENT**. Absent Seller's receipt of written objections from Buyer within five (5) days after the date Buyer receives this Invoice, this Invoice shall constitute the sales agreement between the parties. . . . This Invoice shall constitute a legally binding agreement between the parties hereto and except as otherwise

---

[6] These invoices were No. 13508, dated May 16, 2005, reflecting steel purchases in the total amount of $37,337.31; No. 13509, dated May [illegible], 2005, in the total amount of $10,270.96; and No. 13564, dated May 31, 2005, in the total amount of $71,647.68.

9

provided herein, may not be altered or cancelled except by a writing signed by the parties. Any controversy, interpretation or claim arising out of or relating to this Invoice shall be determined in accordance with the laws of Pennsylvania. In connection with any such controversy or claim, Buyer and Seller (a) each irrevocably submit to the exclusive jurisdiction of the Courts of the Commonwealth of Pennsylvania located in Montgomery County, Pennsylvania or the United States District Court For The Eastern District of Pennsylvania (b) waive any objection to the laying of venue in such courts (c) waive any claim that any such action or proceeding in such courts has been brought in an inconvenient forum (d) waive the right to object that such courts do not have jurisdiction over Buyer (e) waive the right to trial by jury in any suit, action or proceeding brought in respect to any such transaction and (f) designate the Secretary of State of the Commonwealth of Pennsylvania as Buyer's agent for the service of process. This confirmation and all transactions hereunder shall by governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania (excluding choice of conflicts of law doctrines) and all applicable Federal laws and regulations.

Lerch testified that the other 224 invoices IMS received during the 2003-05 period also contained the same forum-selection clause. She added that the invoices were in the same general form except that some were under the letterhead of Global Steel-MI and others were under the letterhead of Global Steel-PA.[7] Lerch conceded that she did not object to the inclusion of the forum-selection clause in any of these invoices.

IMS acknowledges that in each of its steel purchases from a Global Steel entity it formed a contract for the sale of goods that was governed by article 2 of the Texas Uniform Commercial Code (U.C.C.). *See* Tex. Bus. & Com. Code Ann. §§ 2.102, .105, .106 (West 2009). In its first issue, IMS disputes whether the evidence is legally or factually insufficient to support

_____

[7] In addition to the different company names, the Global Steel-MI and -PA invoices contained different corresponding phone numbers, fax numbers, and addresses. Global Steel-PA's address was a Willow Grove, Pennsylvania street address, while Global Steel-MI's was a Willow Grove post office box.

the district court's implied findings and/or legal conclusion that these sales contracts included the terms and conditions printed on the back of each corresponding invoice.  IMS asserts that each such contract had already been formed before the invoice was ever sent.  Relatedly, in its second issue, IMS disputes whether each invoice would be deemed to be an acceptance under section 2.207 of the U.C.C., such that the forum-selection clause would be included in the parties' contracts.  *See id.* § 2.207(b)(2) (West 2009).

To demonstrate when and how the sales contracts were formed, IMS presented Lerch's testimony and documentary evidence.  Lerch described five steps in each of IMS's steel purchase transactions with the Global Steel entities.

- A fax under "Global Steel Corporation" (i.e., Global Steel-PA) letterhead, and addressed to "ALL BUYERS," would be transmitted to IMS.  The documentary evidence includes the faxed pages that generated the transactions underlying IMS's "defective steel" allegations.  Each fax page states, "We own and offer" a type of steel product that was identified in the document by terms used in the industry (e.g., "Prime Hot Rolled Pickled & Oiled HSLA Coils 40 Min Yield").  The document then lists numerous available types or dimensions of the product (e.g., ".420M x 41.4570 x C   39,090#," ".426 x 41.9690 x C   39,190#," etc.), a per unit price, and delivery terms (e.g., "F.O.B. Detroit, MI").  The document also included an "Offer No.," the statement "Subject to Prior Sale," and a phone and fax number.

- Upon receiving such a fax, Lerch testified that if she knew or ascertained that one of IMS's customers would want some of the products listed in the fax, she would call "Global"[8] to ascertain if the products were still available.  If they were, Lerch would then inquire whether she needed to send a written purchase order.  Lerch indicated that while sometimes she could order products over the phone, in other instances she would be required to submit a purchase order.  In the latter case, Lerch recounted that she would fax a purchase order specifying the quantity of the product she wished to purchase, "as well as some additional terms and conditions that I had on my signed purchase order."  A copy of a purchase order for one of the purchases of "defective steel" was in evidence.  As Lerch had described, the purchase

---

[8] Lerch claimed that her contact "99 percent" of the time was Falcoff, the vice president of both Global Steel entities.

11

order—which is on IMS letterhead and addressed to "Global Steel Corp.," albeit at the Global Steel *Corporation* address—specified products, grades, dimensions and weights, quantities desired, per unit cost, and prices for each type of product and the total purchase. The purchase order also included terms and conditions relating to the state of the product and its packaging.[9] At the bottom of the order form is Lerch's signature on a line for "Authorized IMS Buyer."

- After receiving her written or oral order, "Global," Lerch further testified, would generate a "release form" addressed to the warehouse where the steel inventory was located. The release form authorized IMS to take delivery of the steel identified in the document or, if IMS happened to have an account at the same warehouse, to transfer the steel to IMS's account. A copy of this form would also be faxed to IMS. Copies of release forms corresponding to the purchases underlying IMS's "defective steel" allegations were in evidence. Each form bears the name, address, and phone and fax numbers of Global Steel-PA, is addressed to the warehouse, and contains instructions to "TRANSFER MATERIAL BELOW TO" IMS. Below these instructions is a table with columns for "tag #" (a means of identifying steel product that was also used in IMS's purchase order form), quantity, and description. In one of the release forms, identifying information regarding the steel is provided in the table; in the others, the information is contained on documents under the warehouse's letterhead that are attached to the release form.

- Only after the steel was released, according to Lerch, would she receive an invoice with the disputed forum-selection clause on the back. Lerch indicated that "[i]nvoicing from Global would follow within a matter of days from the release or shipment of the steel." According to Lerch, the invoice would usually arrive "before or right after" the steel arrived at IMS or at its customer's location, although in "some instances . . . the steel showed up way after the invoice." Unlike the previous documents the parties had exchanged, the invoices distinguished between Global Steel-PA and -MI, with some invoices (including the three relating to the "defective steel" allegation) under Global Steel-MI letterhead and others under Global Steel-PA letterhead.

---

[9] The terms and conditions included on the IMS purchase order were:

*ALL PRODUCT MUST BE SUITABLE FOR PROCESSING AND MANUFACTURING. MATERIAL MUST BE TRUE TO GAUGE AND TEMPER. NO PEELING OR FLAKING. MATERIAL MUST BE PACKAGED WITH 2 ID BANDS AND ONE BELLY BAND. NO BACK WRAP IN COILS. NO BELLIED EDGES, NO FOLDED OVER LAPS-EDGES, NO TELESCOPING BEYOND 18" MAX WIDTH 72". CHEMISTRIES REQUIRED ON ALL ITEMS. IF NOT PROVIDED A CHARGE FOR 5 PART CHEMISTRY WILL BE DEDUCTED FOR EACH ITEM FROM THE INVOICE.*

- Following receipt of the invoice, IMS would pay for its purchase. The Global Steel entities presented evidence that IMS wrote some checks to "Global Steel Corp." and others to "Global Steel Corporation," although Lerch insisted that she had assumed "Corp." was merely an abbreviation for "Corporation" and that she was dealing with only one "Global Steel" entity.

The Global Steel entities did not present evidence to controvert these facts.

IMS urges that the initial faxes from "Global" constituted an offer that it accepted through its oral or written purchase order, forming a contract whereby it agreed to purchase the steel in accordance with the terms of its order. In the alternative, IMS asserts that its purchase orders were offers that were accepted when Global Steel-PA (or -MI) released the steel, forming a contract whereby IMS agreed to purchase the steel specified in the order and/or release form at the price indicated on the fax and any purchase order. Under either view, IMS argues, the sales contract was formed before it ever received an invoice from Global Steel-PA or -MI. Consequently, IMS reasons, the terms and conditions on the back of the invoice were not included in the parties' sales contract.[10] We agree with IMS.

To establish the existence of an enforceable contract, a party must prove (1) an offer, (2) acceptance of the offer, (3) mutual assent or "meeting of the minds" regarding the subject matter and essential terms of the contract, and (4) consideration, or mutuality of obligations. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007); *Harco Energy, Inc. v. Re-Entry People, Inc.*, 23 S.W.3d 389, 392 (Tex. App.—Amarillo 2000, no pet.) (*citing Federal Sign v. Texas S. Univ.*,

---

[10] Relatedly, IMS also questions how it could form a sales contract containing terms and conditions printed on a Global Steel-MI invoice when the initial faxes and release forms were under the name of Global Steel-PA. We need not address this contention.

13

951 S.W.2d 401, 408-09 (Tex. 1997)). In determining whether the parties have formed a contract through offer, acceptance, and mutual assent to the contract terms, we rely on the objective standard of what the parties said and how they acted, not on their subjective state of mind. *Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 589 (Tex. App.—Austin 2007, pet. denied); *see Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("[T]he parties' intent is governed by what they said, not by what they intended to say but did not.").

In this case, as noted, these general principles governing contract formation are augmented by article 2 of the Texas U.C.C. Section 2.204 of the Texas U.C.C. provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tex. Bus. & Com. Code Ann. § 2.204(a) (West 2009). Further, section 2.206 provides that unless unambiguously indicated otherwise, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." *Id.* § 2.206(a)(1) (West 2009). Applying these principles to IMS's uncontroverted evidence, we conclude that each sales contract was formed at the latest by the "release" of the steel to IMS in response to IMS's oral or written purchase order.

Assuming without deciding that Global Steel-PA's initial fax did not constitute an offer, IMS's purchase orders clearly were offers. *See* Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). Although IMS included its own terms and conditions on its written purchase orders, there was no evidence in those terms or elsewhere that IMS limited Global Steel-PA or -MI's acceptance to any specified

14

manner or medium. Thus, IMS's offer could be accepted through any manner or medium reasonable under the circumstances. *See* Tex. Bus. & Com. Code Ann. § 2.206(a)(1); *see also id.* § 2.206(a)(2) ("an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods"). Having received IMS's order, the Global Steel entity or entities accepted that offer by "releasing" or transferring rights in the steel to IMS, thereby forming a contract whereby IMS would purchase the steel specified in its order and the Global release form at the prices specified in the purchase order and Global fax. *See Tubelite, Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 803 (Tex. 1991); *Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 876-80 (S.D. Tex. 2005) (Texas law). The contract's terms did not include the terms and conditions printed on the back of the invoice because it is undisputed that the invoice had not yet been transmitted to IMS. *See Tubelite*, 819 S.W.2d at 803-04 (agreement to pay interest contained in "acknowledgment" sent by subcontractor to supplier was not part of sales contract; contract had been formed without that term when subcontractor had previously accepted supplier's offer by transmitting written notice requesting supplier to begin work on shop drawings); *Enpro Sys., Ltd.*, 382 F. Supp. 2d at 876-80 (limitations of liability contained in invoice and delivery tickets were not terms of sales contracts formed by component parts manufacturer's acceptance of purchase order by shipping the goods);[11] *see also American Bus. Info., Inc. v. Classic Uniforms, Inc.*,

---

[11] The Global Steel entities attempt to distinguish *Enpro* as involving "a trial court . . . making factual determination based upon the evidence it had been presented." *Enpro* did not turn on factual determinations, but decided cross-motions for summary judgment based on the same sorts of legal determinations regarding contract formation that we address here. *See Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp. 2d 874, 876-80 (S.D. Tex. 2005).

No. 04-01-00199-CV, 2002 Tex. App. LEXIS 916, at *3-5 (Tex. App.—San Antonio Feb. 6, 2002, no pet.) (mem. op.) (applying *Tubelite* to hold on similar facts that contract did not include liability limitation contained in invoice sent after contract had been formed).

On the other hand, U.C.C. section 2.207—the "battle of the forms" provision—provides that "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon." Tex. Bus. & Com. Code Ann. § 2.207(a) (West 2009). Section 2.207 further provides that in contracts for the sale of goods "between merchants" (which IMS concedes was the case with each of its steel purchases from the Global Steel entities) the addition of different terms in such an acceptance become part of the contract unless (1) the offer explicitly limits acceptance to the terms of the offer, (2) they "materially alter" the contract, or (3) the party against whom the additional terms are asserted objects to the additional terms. Consequently, assuming that each invoice sent to IMS constituted an "expression of acceptance" or "written confirmation" under section 2.207, the forum-selection clause contained in each invoice would be deemed part of the Global Steel entity's acceptance of IMS's purchase order. *See id.* Additionally, because there is no evidence that IMS's purchase order explicitly limited acceptance to the terms of that offer and because IMS concedes that it never objected to the invoice's terms and conditions, any contract formed by that acceptance would be deemed to include the forum-selection clause unless the clause constituted a "material alteration" to the contract. *See id.* However, we conclude that section 2.207 had no application here.

Section 2.207 is addressed to two situations. The first is where an offer is made and a written acceptance is sent in return, but the acceptance purports to add additional terms to the contract. *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enter.*, 625 S.W.2d 295, 299 (Tex. 1981) (citing Tex. Bus. & Com. Code Ann. § 2.207 cmt. 1). The second situation to which section 2.207 applies is where an agreement has already been reached by the parties, either orally or through informal correspondence, and is later followed by a formal written confirmation containing both terms already agreed upon and additional terms not previously discussed. *Tubelite*, 819 S.W.2d at 804 (citing Tex. Bus. & Com. Code Ann. § 2.207 cmt. 1). This "written confirmation" refers to the writing necessary to make enforceable a contract that would otherwise be unenforceable under the U.C.C.'s statute-of-frauds provision. *See* Tex. Bus. & Com. Code Ann. § 2.201(a) (contract for the sale of goods for price of $500 or more is unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and is signed by the party against whom enforcement is sought"), (b) ("Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents it satisfies the requirements of Subsection (a) against such party unless written notice of objection to its contents is given within ten days after it is received."); *Enpro*, 382 F. Supp. 2d at 882-84 (explaining that "written confirmation" in section 2.207 refers to a writing necessary to make the sales contract enforceable under the U.C.C.'s statute-of-frauds provision).

This case presents neither of the two situations to which section 2.207 is addressed. The invoices were not acceptances because, as previously explained, acceptance had already

17

occurred before the invoices were transmitted to IMS. *See Tubelite*, 819 S.W.2d at 804; *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 299. Nor were the invoices "written confirmations" necessary to make the sales contracts enforceable under the U.C.C.'s statute of frauds provision. We first note that Lerch testified without dispute that usually IMS or even its customer would receive the steel IMS had purchased before IMS ever received the invoice. The U.C.C.'s statute-of-frauds provision does not require a writing with respect to goods that have been received and accepted. *See* Tex. Bus. & Com. Code Ann. § 2.201(c)(3). Observing that "[c]ourts and scholars have questioned whether [section 2.207] can apply at all to a sale in which the goods have already been shipped and accepted and a memorandum such as an invoice altering the terms is sent contemporaneously with or subsequent to the shipment of the goods," the Texas Supreme Court has held that "the process of acceptance and confirmation to which section 2.207 is addressed stops short of a monthly statement sent after the goods have been shipped." *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 299-30 (adding that, "Were it otherwise, it would be impossible to determine where the process of confirming ended."). Although Lerch did not specify whether the steel was received before the invoice in every one of the steel purchase transactions that underlie IMS's claims, it was the Global Steel entities' burden to establish that the invoices' forum-selection clause was included in the sales contracts the parties formed. *See Phoenix Network Techs. (Europe) Ltd.*, 177 S.W.3d at 611-12 & n.6.

Alternatively, the Global Steel entities' release forms, particularly in combination with the initial fax and the IMS purchase order form, suffice under the U.C.C.'s statute-of-frauds provision without need for an additional written confirmation. *See Padilla v. La France*,

18

907 S.W.2d 454, 460 (Tex. 1995) (writing sufficient to satisfy the statute of frauds need not be contained in a single document).  There are only "three definite and invariable requirements as to the memorandum" required by the U.C.C.'s sale-of-goods statute-of-frauds provision:  (1) it must "evidence a contract for the sale of goods;" (2) it must be "signed," which "includes any authentication which identifies the person to be charged;" and (3) it must specify a quantity.  Tex. Bus. & Com. Code Ann. § 2.201 cmt. 2; *see also id.* cmt. 1 ("All that is required is that the writing afford a basis for believing that the offered oral evidence rests upon a real transaction. . . .The only term which must appear is the quantity term . . . .  The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.").  The Global Steel release forms met these requirements—(1) they identified the parties to the transaction and the steel, and instructed the warehouse to transfer the steel to IMS; (2) they purported to be sent by Global Steel-PA, identified specific employees, and provided the company's address and phone and fax numbers; and (3) they specified the quantities of steel IMS was purchasing, among other specifications and details about the goods.  The release forms satisfied the U.C.C.'s statute-of-frauds requirement. *See Enpro*, 382 F. Supp. 2d at 880-81.

We conclude that the invoices transmitted to IMS in connection with its steel purchases from the Global Steel entities were not "written confirmations" under section 2.207.  Section 2.207, accordingly, does not come into play here. *See id.* at 882-84; *cf. In re Kyocera Wireless Corp.*, 162 S.W.3d 758, 760-62 (Tex. App.—El Paso 2005, orig. proceeding) (applying

19

section 2.207 where purchase order served as written confirmation of previous electronic communications).[12]

In contending that the parties nonetheless formed sales contracts containing the forum-selection clause, the Global Steel entities ultimately rely primarily on what they term their "course of dealing" with IMS. They emphasize evidence that IMS made a total of 227 steel purchases from them between 2003 and the 2005 inception of litigation, that IMS received an invoice containing the forum-selection clause in connection with each purchase, and that IMS never objected to that provision. This evidence, in the Global Steel entities' view, is legally and factually sufficient to support implied findings by the district court that IMS had impliedly agreed to the forum-selection clause with respect to any steel purchases relevant to its claims. We cannot agree.

Under Texas law, a course of dealing—defined as a "sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"—"may give particular meaning to specific terms of the agreement and may supplement or qualify the terms of the agreement." Tex. Bus. & Com. Code Ann. § 1.303(b), (d) (West 2009). In *Preston Farm*, the Texas Supreme Court held that proof of a buyer's course of conduct was sufficient to support a finding that it had impliedly agreed to pay interest charges imposed in monthly statements that were sent after the sales contract was otherwise formed. 625 S.W.2d at 298-300. The supreme court relied on evidence that the buyer had made over twenty credit purchases

---

[12] We thus need not address whether the forum-selection clause would be a "material alteration" to each sales contract or whether, as the Global Steel entities assert, IMS waived such an argument by failing to raise it in the district court.

20

from the seller over the course of a year, that the buyer had received monthly statements conspicuously imposing the interest charge, and that the buyer had paid these charges in full without objection. *See id.* at 298-99.

Subsequently, in *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, the supreme court distinguished *Preston Farm* in holding that a party's (Marine's) mere failure to object to another party's "unilateral act of charging interest on Marine's invoices and deducting those charges" from proceeds due Marine "are not evidence of an agreement between the parties to the . . . interest charge." 644 S.W.2d 443, 445-46 (Tex. 1983). The court reasoned that "[t]here was no evidence of any conduct by Marine indicating its acceptance of those terms" and that, "[w]hile it is true Marine never complained of the interest charges, Marine also never paid them" and did not receive proceeds from which the charge had been deducted. *Id.* Later, in *Tubelite*, the supreme court relied on the same distinction in holding that evidence of a subcontractor's post-contract formation "acknowledgments" purporting to impose finance charges, without more, could not support a finding that the parties had impliedly agreed to modify their existing sales contracts by adding that term. *See* 819 S.W.2d at 804-05. The court explained:

> Acquiescence to the contract by the party to be charged may be implied from his affirmative actions, such as when he continues to order and accept goods with the knowledge that a service charge is being imposed and pays that charge without timely objection. But the mere failure to object to the unilateral charging of interest, without more, does not establish an agreement to pay interest between the parties.

*Id.* at 805 (citing *Triton Oil & Gas Corp.*, 644 S.W.2d at 445; *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 298).

21

Relying on *Preston Farm*, *Triton Oil*, and *Tubelite*, the *Enpro* court held, on facts analogous to this case, that a buyer's mere silence in the face of repeated transmissions of post-contract formation documents purporting to impose liability limitations could not, without more, support a finding of an implied agreement to those terms. *Enpro*, 382 F. Supp.2d at 884-85. While acknowledging that some decisions from other jurisdictions may support a contrary conclusion, the court concluded that "Texas law requires more substantial evidence of parties' shared understanding in order to prove course of dealing"—some "affirmative action" by the party sought to be charged—and held that such proof was lacking. *Id.* at 884-85 ("Enpro's mere silence regarding the delivery ticket/invoice terms—terms to which Enpro has no obligation to voice objection under § 2.207—does not provide a common basis for understanding in the way that affirmative conduct, like actually paying a service charge, does. . . . There is nothing in the record suggesting Enpro ever affirmatively accepted or recognized the terms—for example, by tolerating them in a previous dispute—and then continued to purchase steel from Namasco under the same procedures.").

We are persuaded that this case is controlled by *Tubelite* and *Triton Oil* and is distinguishable from *Preston Farm*. The forum-selection clause at issue here was contained in post-contract formation invoices. The clause was not part of the parties' contracts, nor did IMS have any duty under the U.C.C. to object to it. Further, there is no evidence that IMS had ever acquiesced or assented to any previous attempt by the Global Steel entities to enforce the forum-selection clause against it. In short, there is no evidence of the sort of "affirmative actions" by IMS that are necessary to support a finding that the parties impliedly agreed to the forum-selection clause. *See Tubelite*, 819 S.W.2d at 804-05; *Triton Oil*, 644 S.W.2d at 445; *Enpro*, 382 F. Supp. 2d at 884-85. The bare

22

fact that IMS remained silent in the face of the Global Steel entities' unilateral actions in sending it post-contract formation invoices containing the forum-selection clause does not, without more, support a finding of an implied agreement to that term under Texas law. *See Tubelite*, 819 S.W.2d at 804-05; *Triton Oil*, 644 S.W.2d at 445; *Enpro*, 382 F. Supp. 2d at 884-85.

In addition to their course-of-dealing argument, the Global Steel entities emphasize our standard of review, urging that the applicable "abuse-of-discretion" standard mandates broad deference to the district court's ruling. However, "to state that an appellate issue is governed by an 'abuse-of-discretion' standard of review is merely to beg the question of how broad or narrow the trial court's discretion regarding the issue was." *Texas Dep't of Pub. Safety v. Nail*, ___ S.W.3d ___, ___, No. 03-08-00435-CV, 2010 Tex. App. LEXIS 92, at * 32 (Tex. App.—Austin Jan. 8, 2010, no pet.); *see also* W. Wendell Hall, *Standards of Review in Texas*, 38 St. Mary's L.J. 47, 67-68 (2006) (observing that meaning of "abuse of discretion" varies markedly with the specific issue under review). Here, the decisive issues turn on questions of law—the legal effect of uncontroverted facts concerning the parties' transactions. Whatever deference it may counsel in other contexts, an "abuse-of-discretion" standard of review does not require—or even allow—appellate courts to defer to trial court rulings that turn on an erroneous legal conclusion. *See Perry Homes*, 258 S.W.3d at 598; *Walker*, 827 S.W.2d at 840. Instead, we are bound to apply the governing legal principles de novo, and those principles, as we have seen, mandate reversal here.

We conclude that there was legally insufficient evidence to support implied findings or conclusions that IMS formed contracts with the Global Steel entities that contained the forum-selection clause in dispute. We sustain IMS's first and second issues.

**CONCLUSION**

Having concluded that the evidence is legally insufficient to support the controlling finding or legal conclusion underlying the district court's judgment dismissing IMS's claims—that any sales contracts formed by IMS and the Global Steel entities included the forum-selection clause printed on the backs of the invoices—we must reverse the district court's judgment of dismissal and remand for further proceedings. Because this holding establishes IMS's entitlement to the appellate relief it seeks, we do not reach IMS's remaining issues concerning the forum-selection clause's enforceability and whether the clause applied to all of IMS's claims.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Remanded

Filed:   March 24, 2010

24