TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00172-CV






International Metal Sales, Inc., Appellant


v.


Global Steel Corporation and Global Steel Corp., Appellees






FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT

NO. 05-566-C368, HONORABLE BURT CARNES, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 International Metal Sales, Inc. (IMS) appeals a district court judgment dismissing,
based on a forum-selection clause, claims it had asserted against appellees Global Steel Corporation
and Global Steel Corp. IMS brings four issues on appeal in which it argues that the evidence is
insufficient to support a finding or conclusion that it ever formed a contract containing the forum-selection clause. In the alternative, IMS urges that clause is unenforceable and does not extend to
all of IMS's claims. We will reverse the judgment and remand.


BACKGROUND

 Appellant IMS is a Texas corporation with its principal place of business
in Georgetown, Texas. IMS's president and sole employee is Kimberly Lerch. Appellee
Global Steel Corporation was incorporated in Pennsylvania in 1990 and has its principal place of
business in Willow Grove, Pennsylvania. Appellee Global Steel Corp., on the other hand, was
incorporated in Michigan in 2003, although it operates out of the same location as Global Steel
Corporation, paying Global Steel Corporation for use of office space and employees pursuant to a
management services agreement. The sole shareholders and officers of both Global Steel entities
are Robert Lutsky and Jeffery Falcoff. To the extent the distinction becomes relevant, we will
refer to Global Steel Corporation (the one incorporated in Pennsylvania) as "Global Steel-PA" and
Global Steel Corp. (the Michigan corporation) as "Global Steel-MI." 

 IMS and the Global Steel entities are engaged in the business of distributing
steel products. The steel in which they typically trade is sold in a rolled or coiled form suitable
for ultimate use by manufacturers or fabricators of steel products like shelving, building studs,
and automobile parts. As described by Ms. Lerch during her testimony below, the parties each act
essentially as a middleman, buying steel products from vendors or other distributors for resale to
other distributors and end users. Lerch added that the product inventories are typically located in
public warehouses at which the seller has an account. Lutsky testified that, at all relevant times,
Global Steel-MI owned and traded in steel inventories located exclusively in Michigan warehouses,
while transactions involving steel located anywhere else went through Global Steel-PA. He
explained that this arrangement was designed to yield certain tax benefits. 

 Lerch testified that IMS had a business relationship with Lutsky and Falcoff dating
back to the 1990s and that IMS had traded directly with Global Steel-PA since around 2001. She
acknowledged that IMS also had made numerous purchases from Global Steel-MI since that
company's 2003 incorporation, although she claimed that she had been unaware of the existence of
two separate Global Steel entities until after litigation had begun. According to Lerch, IMS and
"Global Steel" did business "on different levels and with different vendors and customers" and
would buy and sell steel to each other for resale to their respective customers. Lerch further testified
that around 2003, IMS also began serving as a sale or purchase agent for "Global Steel," arranging
transactions directly between "Global Steel" and IMS customers, in exchange for which IMS would
receive a commission.

 Disputes arose and IMS ultimately sued both Global Steel entities. In its live
pleading, IMS alleges essentially three sets of factual allegations that it attributes to both entities
under a single-business-enterprise theory:



 The defective steel allegation. IMS alleges that it purchased "substantial amounts of steel
products from the Defendant [i.e., the alleged "Global Steel" single-business enterprise]
which, upon delivery, were determined, by Plaintiff, to be defective, deficient, or otherwise
not as had been represented by Defendant." IMS pleads that "Defendant acknowledged that
these products were not as offered or as ordered and prevailed upon Plaintiff to retain the
non-conforming products in Plaintiff's inventory for reapplication." IMS alleges that it
agreed to do so "but only upon Defendant's promise that Defendant would replace non-conforming items, would sell and deliver additional products, and reduce purchase price on
future orders from Plaintiff." IMS further pleads that "Defendant" later reneged on its
promises and that it incurred freight, storage, and processing charges, in addition to being left
with "thousands of dollars of non-conforming steel products, for which there was very
limited resale or scrap market."




 The credit line allegation. IMS alleges that in early 2005, Lutsky requested that IMS obtain
a letter of credit to secure its credit purchases. IMS obtained a letter of credit from State
Bank in Austin in the amount of $200,000, with "Global Steel Corporation" (i.e., the legal
name of Global Steel-PA) as the beneficiary. IMS complains that nearly all of approximately
$194,000 in draws thereafter were made by Global Steel Corp. (i.e., Global Steel-MI)
"without the prior knowledge or approval of either Plaintiff or State Bank." 




 The unpaid commissions allegation. IMS alleges that "Defendant" failed to pay it agreed-upon commissions due on sales IMS generated for it as its broker. In addition to the
commission amounts, IMS complains that it is entitled to reimbursement for transportation
and storage costs it incurred on "Defendant's" behalf.



Based on these allegations, IMS asserted causes of action for DTPA violations, fraud, breach of
contract, and breach of warranty. It sought actual damages, additional and exemplary damages,
and attorney's fees.

 Both Global Steel-PA and Global Steel-MI moved to dismiss IMS's suit based on a
forum-selection clause contained in substantively identical invoices the entities had used in
connection with steel sales to IMS. (1) Following a series of evidentiary hearings, the district court
granted the motion and dismissed IMS's suit. (2) After unsuccessfully moving for new trial, IMS
brought this appeal to challenge the district court's judgment of dismissal.


ANALYSIS

 The district court's judgment does not state its specific grounds for dismissal,
nor did the court make findings of fact and conclusions of law. (3) However, as the parties seem to
acknowledge, the district court's judgment of dismissal necessarily rests upon the legal conclusions
that IMS is bound to the contractual forum-selection clause on which the Global Steel entities rely
and that the provision governs each of IMS's claims. In its first two issues, IMS challenges whether
the evidence is legally or factually sufficient to support the finding or conclusion that it ever formed
a contract containing the forum-selection clause. In the alternative, in its third issue, IMS urges that
the clause is unenforceable. Finally, in its fourth issue, IMS argues in the further alternative that if
it is bound by the forum-selection clause, the provision does not extend to all of its claims. IMS's
first two issues are dispositive.

 As the parties seeking to enforce a contractual forum-selection provision, each of the
Global Steel entities had the initial burden of establishing that it and IMS had agreed to an exclusive
forum and that the agreement applied to IMS's claims. See Phoenix Network Techs. (Europe) Ltd.
v. Neon Sys., Inc., 177 S.W.3d 605, 611-12 & n.6 (Tex. App.--Houston [1st Dist.] 2005, no pet.);
see also In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999) (a party seeking to
compel arbitration--a type of forum-selection provision--must establish the existence of an
arbitration agreement and show that the claims raised fall within the scope of that agreement). (4)
Assuming the party seeking enforcement establishes these prerequisites, the burden shifts to the party
opposing enforcement to make a "strong showing" overcoming the prima facie validity of the forum-selection clause. Phoenix Network Techs. (Europe) Ltd., 177 S.W.3d at 611 (quoting M/S Bremen
v. Zapata Off-Shore Co., 407 U.S. 1, 10, 15 (1972)). Assuming the parties agreed to it and it applies
to the claims in question, a forum-selection clause must be enforced unless "the party opposing
enforcement of the clause can clearly show that (1) enforcement would be unreasonable or unjust,
(2) the clause is invalid for reasons of fraud or overreaching, (3) enforcement would contravene
a strong public policy of the forum where the suit was brought, or (4) the selected forum would
be seriously inconvenient for trial." In re Lyon Fin. Servs., 257 S.W.3d 228, 231-32 (Tex. 2008)
(per curiam); see In re Automated Collection Techs., 156 S.W.3d 557, 559 (Tex. 2004) (per curiam)
(enforcement of forum-selection clause is "mandatory" unless party opposing enforcement meets
this burden).

 We review a trial court's decision to enforce or not enforce a forum-selection clause
for abuse of discretion. In re Lyon Fin. Servs., 257 S.W.3d at 231-32. However, to the extent that
our review involves questions of law, the standard of review is de novo. Southwest Intelecom, Inc.
d/b/a Intelecom, Inc. v. Hotel Networks Corp., 997 S.W.2d 322, 324-25 (Tex. App.--Austin 1999,
pet. denied). This is so because a "trial court has no 'discretion' in determining what the law is or
applying the law to the facts," Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992), and, therefore,
"abuses its discretion" if it misinterprets or misapplies the law. Perry Homes v. Cull, 258 S.W.3d
580, 598 (Tex. 2008); Walker, 827 S.W.2d at 840.

 In the absence of findings of fact and conclusions of law, we infer all fact findings
necessary to support the judgment under any legal theory that is supported by the evidence. GJP,
Inc. v. Ghosh, 251 S.W.3d 854, 870 (Tex. App.--Austin 2008, no pet.) (citing BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794-95 (Tex. 2002)); Franklin v. Donoho, 774 S.W.2d
308, 311 (Tex. App.--Austin 1989, no writ), overruled on other grounds, Southwestern Ref. Co.
v. Bernal, 22 S.W.3d 425, 434 (Tex. 2000). (5) Where, as here, a reporter's record has been prepared,
a party may challenge the legal and factual sufficiency of the evidence supporting these implied
findings. BMC Software Belg., N.V., 83 S.W.3d at 795.

 When a party challenges the legal sufficiency of the evidence supporting a finding
on which the opposing party had the burden of proof, it must demonstrate: (a) the complete absence
of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than
a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. See City of
Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review of the
evidence, a court must consider all of the evidence in the light most favorable to the fact finding and
indulge every reasonable inference that would support it. Id. at 822.

 When a party challenges the factual sufficiency of the evidence supporting an adverse
finding on which the opposing party had the burden of proof, we should set aside the finding only
if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. See
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of the
evidence in the record, both supporting and against the finding, to decide whether the finding should
be set aside. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986). 

 During the hearings, Lerch admitted that IMS had made 227 steel purchases from the
Global Steel entities between 2003 and the inception of the litigation. With each of these purchases,
Lerch further conceded, IMS received an invoice under the letterhead of either Global Steel-PA
or Global Steel-MI that contained the forum-selection clause on which the Global Steel entities
now rely. These purchases, Lerch acknowledged, included all of those from which IMS's
"defective steel" and "credit line" allegations arose. However, Lerch denied that IMS received any
invoices in connection with the transactions underlying its "unpaid commissions" allegation because,
she explained, in those transactions the Global Steel entity or entities invoiced the customer directly. 
 Copies of the three invoices underlying IMS's "defective steel" claim--each of which
was under Global Steel-MI letterhead--were in evidence. (6) At the bottom of each invoice was
stated, in approximately eight or nine-point type, "SUBJECT TO TERMS AND CONDITIONS
ON REVERSE SIDE." The terms and conditions on the invoice's reverse side consisted of
fourteen numbered paragraphs prefaced by the following statement centered at the top of the page,
"IT IS AGREED BY THE PARTIES THAT THIS TRANSACTION IS SUBJECT TO THE
FOLLOWING TERMS AND CONDITIONS." Paragraph six of the terms and conditions
contained the forum-selection clause at issue here:


6. ENFORCEMENT. Absent Seller's receipt of written objections from Buyer
within five (5) days after the date Buyer receives this Invoice, this Invoice shall
constitute the sales agreement between the parties. . . . This Invoice shall constitute
a legally binding agreement between the parties hereto and except as otherwise
provided herein, may not be altered or cancelled except by a writing signed by the
parties. Any controversy, interpretation or claim arising out of or relating to this
Invoice shall be determined in accordance with the laws of Pennsylvania. In
connection with any such controversy or claim, Buyer and Seller (a) each irrevocably
submit to the exclusive jurisdiction of the Courts of the Commonwealth of
Pennsylvania located in Montgomery County, Pennsylvania or the United States
District Court For The Eastern District of Pennsylvania (b) waive any objection to
the laying of venue in such courts (c) waive any claim that any such action or
proceeding in such courts has been brought in an inconvenient forum (d) waive the
right to object that such courts do not have jurisdiction over Buyer (e) waive the right
to trial by jury in any suit, action or proceeding brought in respect to any such
transaction and (f) designate the Secretary of State of the Commonwealth of
Pennsylvania as Buyer's agent for the service of process. This confirmation and all
transactions hereunder shall by governed by and construed in accordance with the
laws of the Commonwealth of Pennsylvania (excluding choice of conflicts of law
doctrines) and all applicable Federal laws and regulations.



Lerch testified that the other 224 invoices IMS received during the 2003-05 period also contained
the same forum-selection clause. She added that the invoices were in the same general form except
that some were under the letterhead of Global Steel-MI and others were under the letterhead of
Global Steel-PA. (7) Lerch conceded that she did not object to the inclusion of the forum-selection
clause in any of these invoices.

 IMS acknowledges that in each of its steel purchases from a Global Steel entity it
formed a contract for the sale of goods that was governed by article 2 of the Texas Uniform
Commercial Code (U.C.C.). See Tex. Bus. & Com. Code Ann. §§ 2.102, .105, .106 (West 2009). 
In its first issue, IMS disputes whether the evidence is legally or factually insufficient to support
the district court's implied findings and/or legal conclusion that these sales contracts included
the terms and conditions printed on the back of each corresponding invoice. IMS asserts that each
such contract had already been formed before the invoice was ever sent. Relatedly, in its second
issue, IMS disputes whether each invoice would be deemed to be an acceptance under section 2.207
of the U.C.C., such that the forum-selection clause would be included in the parties' contracts. See
id. § 2.207(b)(2) (West 2009).

 To demonstrate when and how the sales contracts were formed, IMS presented
Lerch's testimony and documentary evidence. Lerch described five steps in each of IMS's steel
purchase transactions with the Global Steel entities.



 A fax under "Global Steel Corporation" (i.e., Global Steel-PA) letterhead, and addressed to
"ALL BUYERS," would be transmitted to IMS. The documentary evidence includes the
faxed pages that generated the transactions underlying IMS's "defective steel" allegations. 
Each fax page states, "We own and offer" a type of steel product that was identified in the
document by terms used in the industry (e.g., "Prime Hot Rolled Pickled & Oiled HSLA
Coils 40 Min Yield"). The document then lists numerous available types or dimensions of
the product (e.g., ".420M x 41.4570 x C 39,090#," ".426 x 41.9690 x C 39,190#," etc.),
a per unit price, and delivery terms (e.g., "F.O.B. Detroit, MI"). The document also included
an "Offer No.," the statement "Subject to Prior Sale," and a phone and fax number.

 Upon receiving such a fax, Lerch testified that if she knew or ascertained that one of IMS's
customers would want some of the products listed in the fax, she would call "Global" (8) to
ascertain if the products were still available. If they were, Lerch would then inquire whether
she needed to send a written purchase order. Lerch indicated that while sometimes she could
order products over the phone, in other instances she would be required to submit a purchase
order. In the latter case, Lerch recounted that she would fax a purchase order specifying the
quantity of the product she wished to purchase, "as well as some additional terms and
conditions that I had on my signed purchase order." A copy of a purchase order for one of
the purchases of "defective steel" was in evidence. As Lerch had described, the purchase
order--which is on IMS letterhead and addressed to "Global Steel Corp.," albeit at the
Global Steel Corporation address--specified products, grades, dimensions and weights,
quantities desired, per unit cost, and prices for each type of product and the total purchase. 
The purchase order also included terms and conditions relating to the state of the product and
its packaging. (9) At the bottom of the order form is Lerch's signature on a line for "Authorized
IMS Buyer."

 After receiving her written or oral order, "Global," Lerch further testified, would generate
a "release form" addressed to the warehouse where the steel inventory was located. The
release form authorized IMS to take delivery of the steel identified in the document or, if
IMS happened to have an account at the same warehouse, to transfer the steel to IMS's
account. A copy of this form would also be faxed to IMS. Copies of release forms
corresponding to the purchases underlying IMS's "defective steel" allegations were in
evidence. Each form bears the name, address, and phone and fax numbers of Global Steel-PA, is addressed to the warehouse, and contains instructions to "TRANSFER MATERIAL
BELOW TO" IMS. Below these instructions is a table with columns for "tag #" (a means
of identifying steel product that was also used in IMS's purchase order form), quantity, and
description. In one of the release forms, identifying information regarding the steel is
provided in the table; in the others, the information is contained on documents under the
warehouse's letterhead that are attached to the release form.

 Only after the steel was released, according to Lerch, would she receive an invoice with the
disputed forum-selection clause on the back. Lerch indicated that "[i]nvoicing from Global
would follow within a matter of days from the release or shipment of the steel." According
to Lerch, the invoice would usually arrive "before or right after" the steel arrived at IMS or
at its customer's location, although in "some instances . . . the steel showed up way after the
invoice." Unlike the previous documents the parties had exchanged, the invoices
distinguished between Global Steel-PA and -MI, with some invoices (including the three
relating to the "defective steel" allegation) under Global Steel-MI letterhead and others under
Global Steel-PA letterhead. 

 Following receipt of the invoice, IMS would pay for its purchase. The Global Steel entities
presented evidence that IMS wrote some checks to "Global Steel Corp." and others to
"Global Steel Corporation," although Lerch insisted that she had assumed "Corp." was
merely an abbreviation for "Corporation" and that she was dealing with only one "Global
Steel" entity.




The Global Steel entities did not present evidence to controvert these facts.

 IMS urges that the initial faxes from "Global" constituted an offer that it accepted
through its oral or written purchase order, forming a contract whereby it agreed to purchase the steel
in accordance with the terms of its order. In the alternative, IMS asserts that its purchase orders were
offers that were accepted when Global Steel-PA (or -MI) released the steel, forming a contract
whereby IMS agreed to purchase the steel specified in the order and/or release form at the price
indicated on the fax and any purchase order. Under either view, IMS argues, the sales contract was
formed before it ever received an invoice from Global Steel-PA or -MI. Consequently, IMS reasons,
the terms and conditions on the back of the invoice were not included in the parties' sales contract. (10) 
We agree with IMS. 

 To establish the existence of an enforceable contract, a party must prove (1) an offer,
(2) acceptance of the offer, (3) mutual assent or "meeting of the minds" regarding the subject matter
and essential terms of the contract, and (4) consideration, or mutuality of obligations. See Baylor
Univ. v. Sonnichsen, 221 S.W.3d 632, 635 (Tex. 2007); Harco Energy, Inc. v. Re-Entry People, Inc.,
23 S.W.3d 389, 392 (Tex. App.--Amarillo 2000, no pet.) (citing Federal Sign v. Texas S. Univ.,
951 S.W.2d 401, 408-09 (Tex. 1997)). In determining whether the parties have formed a contract
through offer, acceptance, and mutual assent to the contract terms, we rely on the objective standard
of what the parties said and how they acted, not on their subjective state of mind. Texas Disposal
Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 589 (Tex. App.--Austin 2007,
pet. denied); see Fiess v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006) ("[T]he parties' intent
is governed by what they said, not by what they intended to say but did not.").

 In this case, as noted, these general principles governing contract formation are
augmented by article 2 of the Texas U.C.C. Section 2.204 of the Texas U.C.C. provides that "[a]
contract for sale of goods may be made in any manner sufficient to show agreement, including
conduct by both parties which recognizes the existence of such a contract." Tex. Bus. & Com. Code
Ann. § 2.204(a) (West 2009). Further, section 2.206 provides that unless unambiguously indicated
otherwise, "an offer to make a contract shall be construed as inviting acceptance in any manner
and by any medium reasonable in the circumstances." Id. § 2.206(a)(1) (West 2009). Applying
these principles to IMS's uncontroverted evidence, we conclude that each sales contract was formed
at the latest by the "release" of the steel to IMS in response to IMS's oral or written purchase order. Assuming without deciding that Global Steel-PA's initial fax did not constitute an
offer, IMS's purchase orders clearly were offers. See Restatement (Second) of Contracts § 24 (1981)
("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another
person in understanding that his assent to that bargain is invited and will conclude it."). Although
IMS included its own terms and conditions on its written purchase orders, there was no evidence in
those terms or elsewhere that IMS limited Global Steel-PA or -MI's acceptance to any specified
manner or medium. Thus, IMS's offer could be accepted through any manner or medium reasonable
under the circumstances. See Tex. Bus. & Com. Code Ann. § 2.206(a)(1); see also id. § 2.206(a)(2)
("an order or other offer to buy goods for prompt or current shipment shall be construed as
inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of
conforming or non-conforming goods"). Having received IMS's order, the Global Steel entity or
entities accepted that offer by "releasing" or transferring rights in the steel to IMS, thereby forming
a contract whereby IMS would purchase the steel specified in its order and the Global release form
at the prices specified in the purchase order and Global fax. See Tubelite, Div. of Indal,
Inc. v. Risica & Sons, Inc., 819 S.W.2d 801, 803 (Tex. 1991); Enpro Sys., Ltd. v. Namasco Corp.,
382 F. Supp. 2d 874, 876-80 (S.D. Tex. 2005) (Texas law). The contract's terms did not include the
terms and conditions printed on the back of the invoice because it is undisputed that the invoice
had not yet been transmitted to IMS. See Tubelite, 819 S.W.2d at 803-04 (agreement to pay interest
contained in "acknowledgment" sent by subcontractor to supplier was not part of sales contract;
contract had been formed without that term when subcontractor had previously accepted supplier's
offer by transmitting written notice requesting supplier to begin work on shop drawings); Enpro Sys.,
Ltd., 382 F. Supp. 2d at 876-80 (limitations of liability contained in invoice and delivery tickets were
not terms of sales contracts formed by component parts manufacturer's acceptance of purchase order
by shipping the goods); (11) see also American Bus. Info., Inc. v. Classic Uniforms, Inc.,
No. 04-01-00199-CV, 2002 Tex. App. LEXIS 916, at *3-5 (Tex. App.--San Antonio Feb. 6, 2002,
no pet.) (mem. op.) (applying Tubelite to hold on similar facts that contract did not include liability
limitation contained in invoice sent after contract had been formed).

 On the other hand, U.C.C. section 2.207--the "battle of the forms"
provision--provides that "[a] definite and seasonable expression of acceptance or a written
confirmation which is sent within a reasonable time operates as an acceptance even though it
states terms additional to or different from those offered or agreed upon." Tex. Bus. & Com. Code
Ann. § 2.207(a) (West 2009). Section 2.207 further provides that in contracts for the sale of goods
"between merchants" (which IMS concedes was the case with each of its steel purchases from
the Global Steel entities) the addition of different terms in such an acceptance become part of
the contract unless (1) the offer explicitly limits acceptance to the terms of the offer, (2) they
"materially alter" the contract, or (3) the party against whom the additional terms are asserted
objects to the additional terms. Consequently, assuming that each invoice sent to IMS constituted
an "expression of acceptance" or "written confirmation" under section 2.207, the forum-selection
clause contained in each invoice would be deemed part of the Global Steel entity's acceptance of
IMS's purchase order. See id. Additionally, because there is no evidence that IMS's purchase order
explicitly limited acceptance to the terms of that offer and because IMS concedes that it never
objected to the invoice's terms and conditions, any contract formed by that acceptance would be
deemed to include the forum-selection clause unless the clause constituted a "material alteration"
to the contract. See id. However, we conclude that section 2.207 had no application here.

 Section 2.207 is addressed to two situations. The first is where an offer is made and
a written acceptance is sent in return, but the acceptance purports to add additional terms to the
contract. Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enter., 625 S.W.2d 295, 299 (Tex. 1981)
(citing Tex. Bus. & Com. Code Ann. § 2.207 cmt. 1). The second situation to which section 2.207
applies is where an agreement has already been reached by the parties, either orally or through
informal correspondence, and is later followed by a formal written confirmation containing
both terms already agreed upon and additional terms not previously discussed. Tubelite, 819 S.W.2d
at 804 (citing Tex. Bus. & Com. Code Ann. § 2.207 cmt. 1). This "written confirmation" refers to
the writing necessary to make enforceable a contract that would otherwise be unenforceable under
the U.C.C.'s statute-of-frauds provision. See Tex. Bus. & Com. Code Ann. § 2.201(a) (contract for
the sale of goods for price of $500 or more is unenforceable "unless there is some writing sufficient
to indicate that a contract for sale has been made between the parties and is signed by the party
against whom enforcement is sought"), (b) ("Between merchants if within a reasonable time a
writing in confirmation of the contract and sufficient against the sender is received and the
party receiving it has reason to know its contents it satisfies the requirements of Subsection (a)
against such party unless written notice of objection to its contents is given within ten days after it
is received."); Enpro, 382 F. Supp. 2d at 882-84 (explaining that "written confirmation" in
section 2.207 refers to a writing necessary to make the sales contract enforceable under the U.C.C.'s
statute-of-frauds provision).

 This case presents neither of the two situations to which section 2.207 is addressed.
The invoices were not acceptances because, as previously explained, acceptance had already
occurred before the invoices were transmitted to IMS. See Tubelite, 819 S.W.2d at 804;
Preston Farm & Ranch Supply, Inc., 625 S.W.2d at 299. Nor were the invoices "written
confirmations" necessary to make the sales contracts enforceable under the U.C.C.'s statute of frauds
provision. We first note that Lerch testified without dispute that usually IMS or even its customer
would receive the steel IMS had purchased before IMS ever received the invoice. The U.C.C.'s
statute-of-frauds provision does not require a writing with respect to goods that have been
received and accepted. See Tex. Bus. & Com. Code Ann. § 2.201(c)(3). Observing that "[c]ourts
and scholars have questioned whether [section 2.207] can apply at all to a sale in which the goods
have already been shipped and accepted and a memorandum such as an invoice altering the terms
is sent contemporaneously with or subsequent to the shipment of the goods," the Texas Supreme
Court has held that "the process of acceptance and confirmation to which section 2.207 is addressed
stops short of a monthly statement sent after the goods have been shipped." Preston Farm & Ranch
Supply, Inc., 625 S.W.2d at 299-30 (adding that, "Were it otherwise, it would be impossible to
determine where the process of confirming ended."). Although Lerch did not specify whether the
steel was received before the invoice in every one of the steel purchase transactions that underlie
IMS's claims, it was the Global Steel entities' burden to establish that the invoices' forum-selection
clause was included in the sales contracts the parties formed. See Phoenix Network Techs. (Europe)
Ltd., 177 S.W.3d at 611-12 & n.6.

 Alternatively, the Global Steel entities' release forms, particularly in combination
with the initial fax and the IMS purchase order form, suffice under the U.C.C.'s statute-of-frauds
provision without need for an additional written confirmation. See Padilla v. La France,
907 S.W.2d 454, 460 (Tex. 1995) (writing sufficient to satisfy the statute of frauds need not
be contained in a single document). There are only "three definite and invariable requirements as
to the memorandum" required by the U.C.C.'s sale-of-goods statute-of-frauds provision: (1) it
must "evidence a contract for the sale of goods;" (2) it must be "signed," which "includes
any authentication which identifies the person to be charged;" and (3) it must specify a quantity. 
Tex. Bus. & Com. Code Ann. § 2.201 cmt. 2; see also id. cmt. 1 ("All that is required is that
the writing afford a basis for believing that the offered oral evidence rests upon a real transaction.
. . .The only term which must appear is the quantity term . . . . The price, time and place of payment
or delivery, the general quality of the goods, or any particular warranties may all be omitted."). The
Global Steel release forms met these requirements--(1) they identified the parties to the transaction
and the steel, and instructed the warehouse to transfer the steel to IMS; (2) they purported to be sent
by Global Steel-PA, identified specific employees, and provided the company's address and phone
and fax numbers; and (3) they specified the quantities of steel IMS was purchasing, among other
specifications and details about the goods. The release forms satisfied the U.C.C.'s statute-of-frauds
requirement. See Enpro, 382 F. Supp. 2d at 880-81.

 We conclude that the invoices transmitted to IMS in connection with its steel
purchases from the Global Steel entities were not "written confirmations" under section 2.207. 
Section 2.207, accordingly, does not come into play here. See id. at 882-84; cf. In re Kyocera
Wireless Corp., 162 S.W.3d 758, 760-62 (Tex. App.--El Paso 2005, orig. proceeding) (applying
section 2.207 where purchase order served as written confirmation of previous electronic
communications). (12)

 In contending that the parties nonetheless formed sales contracts containing
the forum-selection clause, the Global Steel entities ultimately rely primarily on what they term their
"course of dealing" with IMS. They emphasize evidence that IMS made a total of 227 steel
purchases from them between 2003 and the 2005 inception of litigation, that IMS received an invoice
containing the forum-selection clause in connection with each purchase, and that IMS never objected
to that provision. This evidence, in the Global Steel entities' view, is legally and factually sufficient
to support implied findings by the district court that IMS had impliedly agreed to the forum-selection
clause with respect to any steel purchases relevant to its claims. We cannot agree.

 Under Texas law, a course of dealing--defined as a "sequence of conduct concerning
previous transactions between the parties to a particular transaction that is fairly to be regarded
as establishing a common basis of understanding for interpreting their expressions and other
conduct"--"may give particular meaning to specific terms of the agreement and may supplement
or qualify the terms of the agreement." Tex. Bus. & Com. Code Ann. § 1.303(b), (d) (West 2009). 
In Preston Farm, the Texas Supreme Court held that proof of a buyer's course of conduct was
sufficient to support a finding that it had impliedly agreed to pay interest charges imposed in
monthly statements that were sent after the sales contract was otherwise formed. 625 S.W.2d at 298-300. The supreme court relied on evidence that the buyer had made over twenty credit purchases
from the seller over the course of a year, that the buyer had received monthly statements
conspicuously imposing the interest charge, and that the buyer had paid these charges in full without
objection. See id. at 298-99.

 Subsequently, in Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc., the
supreme court distinguished Preston Farm in holding that a party's (Marine's) mere failure to object
to another party's "unilateral act of charging interest on Marine's invoices and deducting those
charges" from proceeds due Marine "are not evidence of an agreement between the parties to the . . .
interest charge." 644 S.W.2d 443, 445-46 (Tex. 1983). The court reasoned that "[t]here was no
evidence of any conduct by Marine indicating its acceptance of those terms" and that, "[w]hile it is
true Marine never complained of the interest charges, Marine also never paid them" and did not
receive proceeds from which the charge had been deducted. Id. Later, in Tubelite, the supreme court
relied on the same distinction in holding that evidence of a subcontractor's post-contract formation
"acknowledgments" purporting to impose finance charges, without more, could not support a finding
that the parties had impliedly agreed to modify their existing sales contracts by adding that term. See
819 S.W.2d at 804-05. The court explained:


Acquiescence to the contract by the party to be charged may be implied from his
affirmative actions, such as when he continues to order and accept goods with the
knowledge that a service charge is being imposed and pays that charge without timely
objection. But the mere failure to object to the unilateral charging of interest, without
more, does not establish an agreement to pay interest between the parties.



Id. at 805 (citing Triton Oil & Gas Corp., 644 S.W.2d at 445; Preston Farm & Ranch Supply, Inc.,
625 S.W.2d at 298).

 Relying on Preston Farm, Triton Oil, and Tubelite, the Enpro court held, on facts
analogous to this case, that a buyer's mere silence in the face of repeated transmissions of post-contract formation documents purporting to impose liability limitations could not, without more,
support a finding of an implied agreement to those terms. Enpro, 382 F. Supp.2d at 884-85. While
acknowledging that some decisions from other jurisdictions may support a contrary conclusion,
the court concluded that "Texas law requires more substantial evidence of parties' shared
understanding in order to prove course of dealing"--some "affirmative action" by the party sought
to be charged--and held that such proof was lacking. Id. at 884-85 ("Enpro's mere silence regarding
the delivery ticket/invoice terms--terms to which Enpro has no obligation to voice objection under
§ 2.207--does not provide a common basis for understanding in the way that affirmative conduct,
like actually paying a service charge, does. . . . There is nothing in the record suggesting Enpro ever
affirmatively accepted or recognized the terms--for example, by tolerating them in a previous
dispute--and then continued to purchase steel from Namasco under the same procedures.").

 We are persuaded that this case is controlled by Tubelite and Triton Oil and is
distinguishable from Preston Farm. The forum-selection clause at issue here was contained in post-contract formation invoices. The clause was not part of the parties' contracts, nor did IMS have any
duty under the U.C.C. to object to it. Further, there is no evidence that IMS had ever acquiesced or
assented to any previous attempt by the Global Steel entities to enforce the forum-selection clause
against it. In short, there is no evidence of the sort of "affirmative actions" by IMS that are necessary
to support a finding that the parties impliedly agreed to the forum-selection clause. See Tubelite,
819 S.W.2d at 804-05; Triton Oil, 644 S.W.2d at 445; Enpro, 382 F. Supp. 2d at 884-85. The bare
fact that IMS remained silent in the face of the Global Steel entities' unilateral actions in sending it
post-contract formation invoices containing the forum-selection clause does not, without more,
support a finding of an implied agreement to that term under Texas law. See Tubelite, 819 S.W.2d
at 804-05; Triton Oil, 644 S.W.2d at 445; Enpro, 382 F. Supp. 2d at 884-85.

 In addition to their course-of-dealing argument, the Global Steel entities emphasize
our standard of review, urging that the applicable "abuse-of-discretion" standard mandates broad
deference to the district court's ruling. However, "to state that an appellate issue is governed by an
'abuse-of-discretion' standard of review is merely to beg the question of how broad or narrow the
trial court's discretion regarding the issue was." Texas Dep't of Pub. Safety v. Nail, ___ S.W.3d ___,
___, No. 03-08-00435-CV, 2010 Tex. App. LEXIS 92, at * 32 (Tex. App.--Austin Jan. 8, 2010,
no pet.); see also W. Wendell Hall, Standards of Review in Texas, 38 St. Mary's L.J. 47, 67-68
(2006) (observing that meaning of "abuse of discretion" varies markedly with the specific issue
under review). Here, the decisive issues turn on questions of law--the legal effect of uncontroverted
facts concerning the parties' transactions. Whatever deference it may counsel in other contexts, an
"abuse-of-discretion" standard of review does not require--or even allow--appellate courts to defer
to trial court rulings that turn on an erroneous legal conclusion. See Perry Homes, 258 S.W.3d
at 598; Walker, 827 S.W.2d at 840. Instead, we are bound to apply the governing legal principles
de novo, and those principles, as we have seen, mandate reversal here.

 We conclude that there was legally insufficient evidence to support implied
findings or conclusions that IMS formed contracts with the Global Steel entities that contained the
forum-selection clause in dispute. We sustain IMS's first and second issues.

CONCLUSION


 Having concluded that the evidence is legally insufficient to support the controlling
finding or legal conclusion underlying the district court's judgment dismissing IMS's claims--that
any sales contracts formed by IMS and the Global Steel entities included the forum-selection clause
printed on the backs of the invoices--we must reverse the district court's judgment of dismissal and
remand for further proceedings. Because this holding establishes IMS's entitlement to the appellate
relief it seeks, we do not reach IMS's remaining issues concerning the forum-selection clause's
enforceability and whether the clause applied to all of IMS's claims. 



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Remanded

Filed: March 24, 2010


 
1. IMS originally filed its suit in June 2005 against "Global Steel Corporation" (i.e., the legal
name of Global Steel-PA). Global Steel-PA filed a motion to dismiss, relying on the forum-selection
clause contained in the invoices it used. In support, it presented an affidavit from Lutsky in which
he averred that "Global Steel" had issued "the 3 invoices in question in this case." An evidentiary
hearing was held, at the conclusion of which the district court denied the motion. Although the
district court did not make findings of fact and conclusions of law, the reporter's record reflects
that a primary focus of the hearing was whether the transactions in dispute were for the sale of goods
of less than $50,000 in value, so as to come within the protections of former section 35.53
of the business and commerce code. See Act of May 29, 1993, 73d Leg., R.S., ch. 570, § 14,
1993 Tex. Gen. Laws 2099, 2145, repealed and recodified by Act of May 15, 2007, 80th Leg., R.S.,
ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 1964-65 (current version at Tex. Bus. & Com. Code
Ann. § 273.002 (West 2009)) (if contract for sale of goods for $50,000 or less "contains a provision
making the contract or any conflict arising under the contract subject to the laws of another state, to
litigation in the courts of another state, or to arbitration in another state, the provisions must be
conspicuously in . . . writing that is bold-faced, capitalized, underlined, or otherwise set out in such
a manner that a reasonable person against whom the provision may operate would notice" and
making non-compliant provisions voidable). During this hearing, IMS took the position, and Lerch
testified, that none of the transactions at issue at the time were for values exceeding $50,000.


 Thereafter, Global Steel-MI sued IMS for breach of contract in Pennsylvania state court. 
Global Steel-MI alleged that IMS had breached its obligation to pay the same three invoices
that were already at issue in IMS's Travis County suit against Global Steel-PA. In fact, as we will
discuss below, the three invoices, which reflect the purchases underlying IMS's "defective steel"
allegation, were each in the name of "Global Steel Corp." (i.e., Global Steel-MI), and reflected
the sale of steel located in Michigan. IMS then added Global Steel-MI to its Williamson County
suit, alleged that both Global Steel entities were liable under a single-business-enterprise theory,
and sought an anti-suit injunction to bar Global Steel-MI from further prosecuting its
Pennsylvania action. Global Steel-MI then filed a motion to dismiss in the Williamson County
litigation based on the forum selection clause contained in the invoices, as well as a plea to abate
the Williamson County litigation pending the disposition of its Pennsylvania action. A hearing was
held, after which the district court granted a temporary anti-suit injunction and denied Global Steel-MI's motion to dismiss and plea in abatement. 
2. The district court ultimately granted a joint motion of Global Steel-PA and -MI to
reconsider the district court's previous rulings on their dismissal motions. The motion emphasized
amended pleadings and evidence tending to demonstrate that the value of sales in controversy
exceeded $50,000, which, the Global Steel entities urged, negated the protections of business
and commerce code former section 35.53. Another evidentiary hearing was held, at the conclusion
of which the district court granted the motion to reconsider and dismissed all of IMS's claims.
3. IMS requested that the district court prepare findings of fact and conclusions of law,
and later filed a notice of past-due findings, but the district court declined to make them. Although
IMS urges that its efforts to obtain findings and conclusions impacts our standard of review,
as discussed below, we do not understand it to be claiming any error in the district court's refusal
to make the findings. To the extent it does, we note that the district court was not required to
make findings and conclusions concerning its pretrial dismissal rulings. See CMS Partners, Ltd.
v. Plumrose USA, Inc., 101 S.W.3d 730, 736 (Tex. App.--Texarkana 2003, no pet.); see also Tex. R.
Civ. P. 296 (requirement that trial court enter findings of fact and conclusions of law applies
"[i]n any case tried in the district or county court without a jury") (emphasis added); IKB Indus.
(Nigeria) Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 443 (Tex. 1997); Awde v. Dabeit, 938 S.W.2d
31, 33 (Tex. 1997). 
4. A motion to dismiss, such as the Global Steel entities each filed here, is an appropriate
procedural vehicle for enforcing a forum-selection clause. See Phoenix Network Techs. (Europe)
Ltd. v. Neon Sys., Inc., 177 S.W.3d 605, 610 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (citing
Accelerated Christian Educ., Inc. v. Oracle Corp., 925 S.W.2d 66, 70 (Tex. App.--Dallas 1996,
no writ)). 
5. Relying on rule 298 of the rules of civil procedure, IMS argues that because it proposed
fact findings that the district court declined to adopt, "no findings or conclusions can be deemed or
presumed." Rule 298, however, applies only "[a]fter the court files original findings of fact and
conclusions of law," and governs the effect of a trial court's failure to make "additional findings or
conclusions" timely requested by a party. Tex. R. Civ. P. 298. Where, as here, the trial court does
not make original findings or conclusions, the presumptions in favor of a judgment's regularity
dictate the standard of review we describe above. Vickery v. Commission for Lawyer Discipline,
5 S.W.3d 241, 251-52 (Tex. App.--Houston [14th Dist.] 1999, pet. denied). 
6. These invoices were No. 13508, dated May 16, 2005, reflecting steel purchases in the
total amount of $37,337.31; No. 13509, dated May [illegible], 2005, in the total amount of
$10,270.96; and No. 13564, dated May 31, 2005, in the total amount of $71,647.68. 
7. In addition to the different company names, the Global Steel-MI and -PA invoices
contained different corresponding phone numbers, fax numbers, and addresses. Global Steel-PA's
address was a Willow Grove, Pennsylvania street address, while Global Steel-MI's was a
Willow Grove post office box.
8. Lerch claimed that her contact "99 percent" of the time was Falcoff, the vice president of
both Global Steel entities.
9. The terms and conditions included on the IMS purchase order were:


ALL PRODUCT MUST BE SUITABLE FOR PROCESSING AND
MANUFACTURING. MATERIAL MUST BE TRUE TO GAUGE AND
TEMPER. NO PEELING OR FLAKING. MATERIAL MUST BE PACKAGED
WITH 2 ID BANDS AND ONE BELLY BAND. NO BACK WRAP IN COILS. 
NO BELLIED EDGES, NO FOLDED OVER LAPS-EDGES, NO
TELESCOPING BEYOND 18" MAX WIDTH 72". CHEMISTRIES REQUIRED
ON ALL ITEMS. IF NOT PROVIDED A CHARGE FOR 5 PART CHEMISTRY
WILL BE DEDUCTED FOR EACH ITEM FROM THE INVOICE.
10. Relatedly, IMS also questions how it could form a sales contract containing terms and
conditions printed on a Global Steel-MI invoice when the initial faxes and release forms were under
the name of Global Steel-PA. We need not address this contention.
11. The Global Steel entities attempt to distinguish Enpro as involving "a trial court . . .
making factual determination based upon the evidence it had been presented." Enpro did not turn
on factual determinations, but decided cross-motions for summary judgment based on the same
sorts of legal determinations regarding contract formation that we address here. See Enpro Sys., Ltd.
v. Namasco Corp., 382 F. Supp. 2d 874, 876-80 (S.D. Tex. 2005).
12. We thus need not address whether the forum-selection clause would be a "material
alteration" to each sales contract or whether, as the Global Steel entities assert, IMS waived such an
argument by failing to raise it in the district court.